**WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. AMERICAN NEEDLECRAFTS, Inc.**

**No. 9455.**

Circuit Court of Appeals, Sixth Circuit.

. Nov. 30, 1943.

Morton Liftin, of Washington, D. C. (Douglas B. Maggs and Bessie Margolin, both of Washington, D. C., Jeter S. Ray, of Nashville, Tenn., and Mortin Liftin and Faye Blackburn, both of Washington, D. C., on the brief), for appellant.

Allen P. Dodd, of Louisville, Ky. (J. R. Layman, of Elizabethtown, Ky., and Allen P. Dodd, of Louisville, Ky., on the brief), for appellee.

Before SIMONS, MARTIN, and McALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

The appellant, Administrator of the Wage and Hour Division of the United States Department of Labor, challenges the decision below in a trial to the court without a jury (46 F.Supp. 16), which, on the principal issue here involved, held certain needleworkers in Kentucky, engaged in processing materials furnished by the appellee and compensated therefor on a piece basis, to be independent contractors and so not subject to the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., which deal with minimum wages, maximum hours, and the keeping of records. Other parties, engaged in activities similar to those of the appellee, intervened in the District Court, praying that their status likewise be adjudicated in the action. A judgment dismissing the appellant's petition was ordered but jurisdiction was retained for the entry of such orders and judgments as may become necessary to dispose of the rights of the intervenors.

As found by the District Judge, the appellee is a New York Corporation, having branch offices or studios in Kentucky, employing there directly some 40 persons and dealing with approximately 500 others who are, for descriptive purposes, referred to as homeworkers. These persons are engaged in appliqueing, quilting, and other needlework performed on comforters, bedspreads, pillow slips, robes, housecoats, and articles of kindred nature, which are manufactured and, after processing, are sold by the appellee in interstate commerce. The material used in manufacturing the products is purchased in New York and sent to the Kentucky studios, for the most part already cut and stamped with the design for the required needlework. It is then delivered by the studios, in convenient bundles, to the homeworker, and when returned and accepted as satisfactory, is either shipped to the New York office or directly to customers.

The appellee secures its homeworkers through local newspaper advertising, personal solicitation, and through the homeworkers themselves. The work upon which these persons are engaged is skilled, and it is claimed that ability to perform it is present nowhere except in certain counties of Kentucky. The persons possessing such skill are women living in the rural districts of such counties, and consist almost entirely of wives, widows, and daughters of farmers, their craftsmanship passing generally from one generation to another. The native art is, however, in some instances, supplemented by instruction on the part of the appellee, either in the studio or the home, such instruction supplement-

ing in detail the basic skill already possessed. Homeworkers are required to prove their qualifications before work is entrusted to them.

Material which is distributed for appliqueing, bears upon it a stamped pattern, and monogramming is done from a paper model. Instructions as to kind or color of thread are given to the worker when the arrangement is entered into, and the worker is required to comply strictly with the pattern and specifications so furnished. During performance there is no supervision or inspection of the work, the studio looking exclusively to the finished article in determining whether it has been satisfactorily processed. The date on which the work is to be performed is sometimes entered on a ticket accompanying the material, and at other times indicated to the worker orally. So with the amount of compensation. It also is entered on the ticket in some instances, and in others is stated to the worker upon the return and inspection of product. When new designs are adopted compensation is sometimes the result of discussion and agreement with consideration given to the skill, effort, and time involved in previous work on comparable articles. There is no obligation on the part of the homeworker to undertake any work, and no discrimination practiced against one who declines to take particular kinds of work, or who discontinues work at any time. The workers are entirely free agents in respect to the amount of time put upon the work from day to day, being limited in that respect only by the date set for completion and return. In seasons of the year when work on the farm is heavy, little time is available and little work undertaken. It is generally done at odd times as farm duties and housework permit. The simple equipment necessary to performance, consisting of a frame and clamps, needles, thimbles, and wooden horses, are provided by the worker at her own expense.

It frequently happens that the person to whom the work is issued and charged, will turn it over to other members of the family or to neighbors, and sometimes she will do but a part and let others do the rest. In some instances one person will come to the studio and receive, in her own name, bundles for both herself and neighbors. The studio keeps a record only of those who receive the material and such persons are paid for the completed work

when it is delivered. The studio reserves the right to inspect the completed article upon its return, and to reject it and decline to pay for the work if not satisfactorily done according to pattern and specifications. There is no restriction against persons working both for the appellee and its competitors during the same period of time, and in instances workers have done so. Occasionally the appellee has rush orders which require delivery at a date earlier than usual. Some workers accept such rush orders which require long hours of work per day, but they are not required to do so nor are they discriminated against because of refusal.

Work is paid for on a piece basis when it is returned to the studio. The appellee is not advised as to the time given to the completion of any piece of work, and keeps no record thereof. In most instances the worker herself keeps no record, and some consider the activity merely a pastime from which additional income may be obtained to supplement farm income. A few, however, devote practically all their time to it and consider it regular employment from which they earn their living. In cases where data has been kept, workers have earned an average of 8 to 15 cents an hour, and in some instances as little as 50 cents for a day of 8 to 10 hours, the rate of compensation varying by reason of differences in skill, physical ability, and effort expended.

It is conceded that the persons engaged in the activities thus described are in commerce or engaged in the production of goods for commerce, and that the appellee, in respect to the homeworkers, did not comply with the provisions of §§ 6, 7, or 11 (c) of the Act in that it failed to pay the designated minimum wage, to comply with limitations upon hours, or to keep records in respect to wages or hours. The defense was that the homeworkers are not employees as defined by the Act, but are independent contractors and so not covered. The Administrator contended that the homeworkers are not only employees but that even if classed as independent contractors under the common law are yet within the protection of the Act.

The court, basing its reasoning upon the lack of supervisory control over the manner in which, or the time when the work was to be done by the homeworkers, and the absence of power reserved or exercised by the appellee to terminate employment before completion, and upon the inference

that the Congress in enacting the Fair Labor Standards Act did not intend to destroy long-established rules affecting the relationship of employer and employee, concluded that neither at common law nor under the statutory definition were the homeworkers employees subject to the provisions of the Act.

■■ It will avail us little to consider whether the master-servant relationship existed between the appellee and its homeworkers under the common law, and we may assume that the well-considered opinion of the District Judge was, in that respect, sound, even though there are cases, both state and federal, which hold that an employer-employee status may exist when there is no continuous supervision over the work if there is such supervision as the nature of the work requires. Our decision in Western Express Company v. Smeltzer, 6 Cir., 88 F.2d 94, 112 A.L.R. 74, is sufficiently illustrative of such line of authority. We are dealing, however, with a specific statute which, like the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., is of a class of regulatory statutes designed to implement a public social, or economic policy through remedies not only unknown to the common law but often in derogation of it. N. L. R. B. v. Colten, 6 Cir., 105 F.2d 179; Agwilines, Inc., v. N. L. R. B., 5 Cir., 87 F.2d 146, 150, 151; Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38. If the Act presently considered, expressly or by necessary implication, brings within the scope of its remedial and regulatory provisions, workers in the status here involved, we are not concerned with the question whether a master-servant relationship exists under otherwise applicable rules of the common law.

The Fair Labor Standards Act, § 203, Title 29 U.S.C.A., provides:

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *.

"(e) 'Employee' includes any individual employed by an employer. * * *

"(g) 'Employ' includes to suffer or permit to work." .

Much has been written concerning the meaning of subsection (g). It was said by the court of the Fifth Circuit in Bowman v. Pace Company, 119 F.2d 858, 860, so greatly relied upon by the appellee: "It is not the purpose of the Fair Labor Standards Act to create new wage liabilities, but where a wage liability exists, to measure it by the standards fixed by law." This statement of principle is, however, illuminated by the illustration which immediately follows. "If one has not hired another expressly, nor suffered or permitted him to work under circumstances where an obligation to pay him will be implied, they are not employer and employee under the Act." There would seem to follow from this negation, an affirmation that if one does suffer or permit another to work under circumstances where an obligation to pay him will be implied, they are employer and employee under the Act. The problem in the Pace case was not to determine whether a master-servant relationship existed at all, but whether it existed between the employee and the industry sought to be regulated as an employer. If such relationship existed between the employee and an intermediate independent contractor, the defendant was not accountable for violation of law. The same was true in our case of Walling v. Sanders, 6 Cir., 136 F.2d 78, 81, where we said "in so broadly defining the word 'employ' Congress undoubtedly had a purpose to relieve complainants of the necessity of proving a contract of employment," and pointed out that to so construe it as to include not only those who work for an accused employer but also those who work for anybody else, such construction would "encompass all employed humanity." Neither the Pace case nor others like Fleming v. Gregory, D.C., 36 F. Supp. 776; Thompson v. Daugherty, D.C., 40 F.Supp. 279; David v. Boylan's Private Police, D.C., 34 F.Supp. 555, and Maddox v. Jones, D.C., 42 F.Supp. 35, which concern themselves primarily not with the existence of a master-servant relationship but with determining who is the master and who the servant, all fail to reach the problem here presented. Nor are cases relied upon by the appellant, such as Fleming v. Palmer, 1 Cir., 123 F.2d 749, dispositive of the issue when they hold that intermediate contractors, interposed between those who do the work and those who receive its benefit, do not destroy the employer-employee relationship when they are but the instrumentalities or agents of the employer created or availed of for the purpose of evading the law. The distinctions heretofore noted were clearly perceived by Judge McDuffie in the excellent analysis of Maddox v. Jones, supra, which is so urgently pressed upon us.

Were there doubt that the statutory definition of the word "employ" brings within the purview of the regulatory and remedial provisions of the Act, workers who perform for an industry under circumstances which create an obligation on the part of the industry receiving the benefit of such work, to pay compensation directly to them, and when the situation is freed from the problem which arises out of the presence of an intermediate contractor who may, in some cases, be a good-faith, independent contractor, and in others a mere instrumentality of the industry, it is to be resolved by the legislative history of the Fair Labor Standards Act. Section 6(a) provides as follows: "Every employer shall pay to each of his employees * * * wages at the following rates * * * (5) If such employee is a homeworker in Puerto Rico or the Virgin Islands, not less than the minimum piece rate prescribed by regulation or order. * * *" So it is persuasively reasoned that the permissible relaxation by the Administrator of statutory standards in the case of homeworkers in Puerto Rico and the Virgin Islands, carries with it an inescapable implication that homeworkers generally are included in the statutory definition of "employee." The inference is strengthened by the fact that when the Black-Connery Bill was first considered it contained a provision in § 6(a) giving the Board power to define, by regulation or order, the determination of the number of employees employed by any employer through the use of agents, independent contractors, subsidiary or controlled companies, or home or off-premise employees. This provision was eliminated in the Senate Committee as giving too much discretionary power to the Board, the Committee asserting, in reporting out the Bill on July 8, 1937, that the purpose of original § 6(a) was sufficiently served by the expanded definition of the word "employ" now incorporated as sub-section (g) of the Act,—a definition to which Senator (now Mr. Justice) Black referred as "the broadest definition that has ever been included in any one Act." (81 Cong. Rec. 7657.) Subsequent history gives added clarification to Congressional intention. Several bills were introduced in the House in 1939 proposing that the Act should be amended to authorize the Administrator to permit the employment of rural homeworkers at wage rates lower than the statutory minimum. The proposals failed,—the Committee on Labor of the House reporting its view that "The Act at the present time treats homeworkers just as any other type of employee." It is apparent from the debates that the purpose of the Congress was not to open the door to the return of the sweatshop system of unpleasant memory.

█ The then Assistant Attorney General (now Mr. Justice) Robert H. Jackson, pointed out in testimony before the legislative committee, that the Black-Connery Bill was clearly designed to authorize control over industrial homework practices; "the factory which sends out and makes use of people in their homes are not exempt just because they are using premises they do not pay rent for." While he was careful to indicate that probably not all persons designated as homeworkers would be reached by the Bill, in saying that, "the family that engages in some little commodity which is a homecraft, as you might call it, on its own, would probably not be reached by the Bill," it was manifest that he had in mind crafts other than those by which articles are processed for manufacturing industries, which furnish the material, instruction and design, and market broadly the completed product. We find it unnecessary to determine whether all homeworkers come within the purview of the Act, but are compelled by the scope of its definition of the term "employee" to hold that the workers here considered are within its protection.

█ A minor issue remains to be determined. The court held that the studio workers of the appellee were employees as defined by the Act. It is conceded that they are, although the appellee urges that such employees do not come within the Embroidery, Textile or Apparel Codes, on the ground that no representative of the particular industry was selected upon the Board charged with administration. The argument is without merit. Clearly it would be neither convenient nor possible in the regulation of an industry generically considered, to give representation to every specialized branch thereof. The court was asked to make specific findings, but failed to do so. The issue in respect to violation was never adequately tried. Since the case must be reversed it is to be assumed that the Administrator will be permitted to develop, if he can, such further facts concerning the wages and hours of the studio employees as are required to sustain the allegations of the pleadings.

Reversed and remanded for further proceedings consistent herewith.