### LA LONE v. UNITED STATES et al.
### No. 404.

District Court, E. D. Washington, N. D.

Nov. 27, 1944.

Justin C. Maloney, of Spokane, Wash., for plaintiff.

Francis M. Shea, Asst. Atty. Gen., and Edward M. Connelly, U. S. Atty., of Spokane, Wash., for defendants.

SCHWELLENBACH, District Judge.

The defendants have moved for summary judgment on the ground that there is no genuine issue as to any material fact and that defendants are entitled to judgment as a matter of law. On December 7, 1942, plaintiff filed application under the Social Security Act as amended, 53 Stat. 1362, 42 U.S.C.A. § 401 et seq., for child's insurance benefits, Section 202(c) of the Act as amended, 42 U.S.C.A. § 402(c) for four of her infant children, based upon the alleged status of her husband, Dwight J. LaLone, as an insured individual under the Act. He died on November 20, 1942.

On February 19, 1943, the Bureau of Old-Age and Survivors Insurance of the Social Security Board denied the application on the ground that the wage earner was not a fully or currently insured individual. Plaintiff disagreed with the determinations. She requested and was given a hearing before a referee of the Social Security Board. The referee held that the wage earner was not a fully or currently insured individual for the reason that he was not an employee within the contemplation of the statute for a sufficient period prior to his death.

Thereupon plaintiff appealed to the Appeals Council of the Social Security Board which affirmed the referee on March 11, 1944, and adopted his findings of fact and statement of reasons. Under the practice of the Social Security Board this became the final decision of the Board. Plaintiff then brought this action to review the denial of her claims on behalf of her children, pursuant to the jurisdiction conferred by Section 205(g) of the Social Security Act.

Section 205(g), 42 U.S.C.A., Section 405 (g), the jurisdictional provision of the Act which authorizes the action to review the administrative decision, provides that "As part of its answer the Board shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based." This has been done.

The applicable statute provides in part as follows: "Any individual * * * may obtain a review of such decision by a civil action commenced within sixty days * * *. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides. * * * The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Board, with or without remanding the cause for a rehearing. The findings of the Board as to any fact, if supported by substantial evidence, shall be conclusive, * * *." 42 U.S.C.A. § 405 (g).

Section 209(a) of the Social Security Act as amended, 42 U.S.C.A. § 409(a), provides that "the term 'wages' means all remuneration for employment * * *." Section 209(b) of the Social Security Act as amended, 42 U.S.C.A., Section 409(b), defines employment as "any service performed after December 31, 1936, and prior to January 1, 1940, which was employment as defined in section 210(b) of the Social Security Act prior to January 1, 1940 * * *," and with exceptions not here pertinent, "any service, of whatever nature, performed after December 31, 1939, by an employee for the person employing him * * *." Section 210(b) of the Social Security Act in effect prior to January 1, 1940, 49 Stat. 625, 42 U.S.C.A. § 410, defines "employment" to mean, with exceptions not here pertinent, "any service, of whatever nature, performed within the United States by an employee for his employer." The pertinent regulations are found in the footnote.[1]

---

[1] Regulations 90 and 91 relating to the definitions of employment are as follows: "Generally the relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which the result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer are the furnishing of tools and the furnishing of a place to work, to the individual who

At the threshold of the case, I am met with defendant's contention that the order of the Social Security Board is conclusive and binding upon this Court. I give full recognition to the principle that resolving the question of the status of the wage earner belongs to the usual administrative routine of the Board. Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 86 L.Ed. 301. Unquestionably the Board's determination is to be accepted if it has warrant in the record and a reasonable basis in law. National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851. However, if the applicable statute and regulations properly interpreted forbid the method of analysis of the testimony followed by the Board, the Board's decision "would not be 'in accordance with law' and the Court would be empowered to modify or reverse it. Whether it is true is a clear-cut question of law and is for decision by the courts." Dobson v. Commissioner, 320 · U.S. 489, 492, 64 S.Ct. 239, 242. After a careful review of the record in this case and a study of the referee's decision, I am convinced that the referee reached his conclusion without regard to the statute or regulations and that his determination has no reasonable basis in law and that his factual analysis has no warrant in the record.

First: A careful study of the referee's decision can bring one to no other conclusion than that he totally ignored the applicable regulation. He concluded that LaLone was a partner or joint adventurer in the insurance business. He emphasized the importance of statements LaLone made in which he referred to himself as a partner. At no place in his decision did the referee refer to that portion of the regulation reading: "If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if two individuals in fact stand in the relation of employer and employee to each other, it is of no consequence that the employee is designated as a partner, coadventurer, agent, or independent contractor." He gave no consideration to the testimony that the two Barretts had the right to control and direct the methods of operation, but stressed the testimony that such direction and control was infrequent. In this, the referee ignored the provision in the regulation reading: "In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has a right to do so. "At no place in his decision did the referee discuss the testimony submitted as to the right of the Barretts to terminate the relationship on their own volition. In this the referee ignored the provision of the regulation reading: "The right to discharge is also an important factor indicating that the person possessing that right is an employer." The referee gave no weight to the testimony showing that the Barretts furnished the office space out of which LaLone worked. In doing this, the referee disregarded that portion of the regulation reading: "Other factors characteristic of an employer are the furnishing of tools and the furnishing of a place to work to the individual who performs the services." This interpretative regulation represents a "contemporaneous construction of the statute by the men charged with the responsibility of setting its machinery in motion, making the parts work efficiently and smoothly while they are yet untried and new," and is entitled to great weight. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796; United States v. American Trucking Associations, Inc., 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; White v. Winchester Country Club, 315 U.S. 32, 41, 62 S.Ct. 425, 86 L. Ed. 619. Certainly, the referee had no

---

performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor, not an employee.

"If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if two individuals in fact stand in the relation of employer and employee to each other, it is of no consequence that the employee is designated as a partner, coadventurer, agent, or independent contractor.

"The measurement, method, or designation of compensation is also immaterial, if the relationship of employer and employee in fact exists."

right to ignore that which the courts are commanded to respect.

■ Second: the referee's approach to the problem here involved completely ignored the broad aspects of the statute with the administration of which this agency is charged. The Social Security Act was passed to meet the challenge of the great economic and social problems which confronted the Nation as an outgrowth of the evils of unemployment, old-age penury and juvenile dependency. The best statement of its objectives can be found in the testimony of Senator Wagner, the sponsor of the legislation, before the Senate Committee on Finance on January 22, 1935. See: Hearings, Economic Security Act, United States Senate Committee on Finance, 74th Cong. 1st Session, S. 1130, p. 2. Whether an individual comes within the classification of "employee" must be answered from the history, terms and purposes of the legislation. The word is not treated by Congress as a word of art, as having a definite meaning. Rather, it takes color from its surroundings in the statute where it appears. United States v. American Trucking Associations, Inc., 310 U.S. 534, 545, 60 S.Ct. 1059, 84 L.Ed. 1345. The word derives meaning from the context of that statute which "must be read in the light of the mischief to be corrected and the end to be attained." South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 259, 60 S.Ct. 544, 549, 84 L.Ed. 732. The Ways and Means Committee of the House of Representatives clearly demonstrated its purpose to cause a liberal interpretation of the word by this language, in its Report of June 6, 1939. See: House Report #728, 76th Cong., 1st Session, Congressional Record, V. 84, pt. 6, p. 6711, et seq.: "The enactment of the Social Security Act marked a new era, the Federal Government accepting, for the first time, responsibility for providing a systematic program of protection against economic and social hazards." Later, in the same Report (see, p. 6729) that Committee said: "A restricted view of the employer-employee relationship should not be taken in the administration of the Federal old-age and survivors insurance system in making coverage determinations. The tests for determining the relationships laid down in cases relating to tort liability and to the common-law concept of master and servant should not be narrowly applied." The defendants place great emphasis upon a statistical showing of the percentage of workers within the country not covered by the Act. Report, Social Security Board, 1943, p. 14. The restriction upon the coverage does not stem from the language Congress used in defining "employer," "employee," or "employment." It is the result of fifteen restrictive exceptions withholding from coverage certain specified classes of workers. I am not entirely unfamiliar with the legislative background of this statute. A review of its legislative history must convince one that the restriction of the coverage was effectuated by opponents to the legislation unwilling to oppose its general purposes and forced to a program of legislative attrition by the means of restrictive amendments.

The referee, in analyzing the facts of this case, indisputably demonstrates his belief that such facts should be analyzed upon the basis of the common-law concept to the end that the employer-employee relationship should, if possible, be avoided. In so doing, he ran directly contrary to the command of the Supreme Court when, in discussing the National Labor Relations Act, it delineated the steps to be taken in determining the existence or nonexistence of the employer-employee relationship. National Labor Relations Board v. Hearst Publications, supra [322 U.S. 111, 64 S.Ct. 857]. The language there used is applicable here. "Congress, on the one hand, was not thinking solely of the immediate technical relation of employer and employee. * * * Congress had in mind a wider field than the narrow technical legal relation of 'master and servant,' as the common law had worked this out in all its variations, and at the same time a narrower one than the entire area of rendering service to others. The question comes down therefore to how much was included of the intermediate region between what is clearly and unequivocally 'employment,' by any appropriate test, and what is as clearly entrepreneurial enterprise and not employment.

"It will not do, for deciding this question as one of uniform national application, to import wholesale the traditional common law conceptions or some distilled essence of their local variations as exclusively controlling limitations upon the scope of the statute's effectiveness. To do this would be merely to select some of the local, hairline variations for nation-wide application and thus to reject others for coverage un-

der the Act. That result hardly would be consistent with the statute's broad terms and purposes.

"Congress was not seeking to solve the nationally harassing problems with which the statute deals by solutions only partially effective. * * * Yet only partial solutions would be provided if large segments of workers about whose technical legal position such local differences exist should be wholly excluded from coverage by reason of such differences. Yet that result could not be avoided, if choice must be made among them and controlled by them in deciding who are 'employees' within the Act's meaning. Enmeshed in such distinctions, the administration of the statute soon might become encumbered by the same sort of technical legal refinement as has characterized the long evolution of the employee-independent contractor dichotomy in the courts for other purposes. The consequences would be ultimately to defeat, in part at least, the achievement of the statute's objectives. Congress no more intended to import this mass of technicality as a controlling 'standard' for uniform national application than to refer decision of the question outright to the local law."

The Circuit Court of Appeals for the Sixth Circuit had for decision a question of employer-employee relationship under the Fair Labor Standards Act. In its interpretation, it laid down this standard: "We are dealing, however, with a specific statute which, like the National Labor Relations Act, 29 U.S.C.A. § 151, is of a class of regulatory statutes designed to implement a public social, or economic policy through remedies not only unknown to the common law but often in derogation of it. * * * If the Act presently considered, expressly or by necessary implication, brings within the scope of its remedial and regulatory provisions, workers in the status here involved, we are not concerned with the question whether a master-servant relationship exists under otherwise applicable rules of the common law." Walling v. American Needlecrafts, 139 F.2d 60, 63.

The Circuit Court of Appeals for the Fourth Circuit had this statute before it for interpretation. United States of America v. Vogue, Inc., 145 F.2d 609. That court, speaking through Judge Parker, said: "The Social Security Act, like the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. and the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. was enacted pursuant to a public policy unknown to the common law; and its applicability is to be judged rather from the purposes that Congress had in mind than from common law rules worked out for determining tort liability. * * * Whatever conclusion might be drawn, however, as to whether Mrs. Fulton and Mrs. Woodfin were or were not independent contractors under the rules of the common law as applied in the several states, we think there can be no question that they and their assistants should be held to be employees of plaintiff within the meaning of the Social Security Act as amended. 26 U.S.C.A. Int.Rev.Code, §§ 1400, 1410. The purpose of that act was to provide old age, unemployment and disability insurance * * *."

■ The inhospitable scope with which the referee viewed the statutory definition of "employee" is well demonstrated in the emphasis placed by him upon an unsigned written proposal proffered to LaLone by the Barretts.[2] As to this feature, I must confess that I am handicapped by the

[2] The extent to which the courts frown upon such an attitude of viewing a statute was best described by Mr. Justice Holmes, on Circuit, when he wrote in Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194: "A statute may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enact-ment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." See, also, Frankfurter, J., in Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 391, 59 S.Ct. 516, 83 L.Ed. 784, and United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788; Taft, C. J., in United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 385–389, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; Sutherland, J., in Funk v. United States, 290 U.S. 371, 381, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136; Cardozo, J., in Van Beeck v. Sabine Towing Co., 300 U.S.

awkward handling of the facts by the referee in his decision. The courts do not expect of an administrative agency that exactness or nicety which the appellate courts require of us inferior judges in distinguishing between findings of fact and conclusions of law. Nonetheless, it does not seem unreasonable to me to suggest that judicial review cannot be nullified by a confused mixture of findings, inferences and conclusions in the referee's decision. Beaumont, S. L. & W. R. Co. v. United States, 282 U.S. 74, 86, 51 S.Ct. 1, 75 L. Ed. 221; State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291; United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 488, 62 S.Ct. 722, 86 L.Ed. 971; United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 510, 55 S.Ct. 462, 79 L.Ed. 1023; Eastern-Central Motor Carriers Association v. United States, 321 U.S. 194, 212, 64 S.Ct. 499. This unsigned proposal was received in evidence and discussed in detail by the referee. I give full recognition to the principle that administrative agencies usually are not restricted to the same rules of evidence as apply in court proceedings and that the Board is permitted to consider that which would be objectionable in a court of law if it is of a kind on which fair-minded men are accustomed to rely in serious matters. Opp Cotton Mills, Inc., v. Administrator, 312 U.S. 126, 155, 657, 61 S.Ct. 524, 85 L.Ed. 624; National Labor Relations Board v. Remington Rand, 2 Cir., 94 F.2d 862, 873; Ellers v. Railroad Retirement Board, 2 Cir., 132 F.2d 636, 639. However, here was a piece of evidence as to a mere offer to contract upon which clearly there was no meeting of the minds. The referee recognized this and, at one point, he indicated his intention to disregard it. Yet it is clear, from the reading of his decision, that the unsigned proposal was of controlling influence and weight with him. It is true that the witness Barrett testified that he thought the proposed writing stated his understanding with LaLone; yet the remainder of his testimony conclusively negatives such a conclusion by him. The agreement was unsigned; its terms were disregarded; there was no justification for the referee emphasizing its importance as he did in reaching his conclusions. Undoubtedly, the referee properly received the proposed contract. I refer to the emphasis placed by him on it merely to indicate the restricted field of vision with which he approached the problem.

In my opinion, the testimony submitted here establishes an employer-employee relationship not unfamiliar to those who have had some practical business experience. F. S. Barrett and his son had been in the real estate business in Spokane for many years. As a young man LaLone went to work for them selling insurance. Under their direction and supervision, he was so successful that a local bank made him an offer of a position as manager of its insurance department. He left the Barretts under most friendly circumstances. Upon the failure of the bank, LaLone purchased the insurance business of the bank and started out on his own. Like so many men with sales ability, LaLone failed when faced with the responsibility of management. By 1938, his business reached a point where he owed substantial sums of money to the companies he represented for commissions he had collected. He faced serious consequences unless such commissions could be paid. In his decision, the referee stresses the value of LaLone's insurance assets. To the uninitiated, such insurance accounts might seem valuable. With commendable modesty the referee admitted his unfamiliarity with the insurance business. The fact is that there is nothing less valuable than the insurance accounts of an agent who becomes delinquent with the companies he represents. He not only loses the right of representation of those particular companies, but he loses the opportunity of representation of any other companies. What he has is worthless. This was the situation confronting LaLone in 1938. Then he went back to his old employers, the Barretts. They were willing to assist their former employee. They advanced the necessary funds with which he could make up his delinquencies. They took his notes for such amounts. They acquired the right to enforce the payment of those notes by discontinuing the relationship that was established. He went to work for $200 a month. It is true that he hoped, as did the Barretts, that an insurance partnership

342, 350, 351, 57 S.Ct. 452, 81 L.Ed. 685; Lord Birkenhead, L.C., in Bourne v. Keane, [1919] A.C. 815, 830; Stone, The Common Law in the United States

(1936) 50 Harv.L.Rev. 4, 13; Landis, Statutes and the Sources of Law, Harvard Legal Essays, p. 213.

later could be evolved. What he had at the time and during the entire time he was working there was simply a provisional arrangement whereby he could become a partner upon the success of the enterprise. The Barretts furnished the place at which the business was transacted; LaLone adjusted his working hours to comply with the office hours of the Barretts. The Barretts decided on the important questions of policy and had the right to decide on all questions of policy. It is true that they used the name Barrett-LaLone Insurance Agency. That, however, was simply a business device intended for the purpose of developing and retaining any business that might be secured. It is true LaLone had the right to sign checks along with Mr. Barrett. That is no proof of a partnership relationship. Many employees are given the dubious honor of signing checks without any proprietary interest in the business. The referee made much of the fact that, without the Barretts' consent, LaLone sold his insurance accounts to the Vermont Loan and Trust Company in 1942, and paid back to the Barretts the amount of money they had loaned to him. I can readily understand how anyone inexperienced in business practices would construe this to mean that at all times LaLone maintained a proprietary interest in his business and was working for himself. Actually, all he had was the right to recapture these accounts if they became valuable and he could secure a sum sufficient to pay off his debt. This case presents an excellent illustration of what was discussed by Judge Parker in an address before the section on Patent, Trademark and Copyright Law of the American Bar Association (American Bar Association Journal, v. 30, p. 623). Judge Parker was there discussing the proposed creation of a patent court. He said: "What is needed there is not so much a court of experts, as a court of wide experience and sound common sense. Everybody knows that the training which makes a man an expert necessarily narrows his field of vision and renders him impractical in matters outside his specialty. * * * What is needed is not the bookish approach of the scientist to the problem but the common sense approach of a court accustomed to deal with all sorts of human relationships." There was nothing unusual or uncommon about this relationship between the Barretts and LaLone. He had worked there before. When he got into financial difficulties, they were willing to help him out. Of course, they permitted him to make a deal whereby he could better his situation. That did not mean that he had been in partnership with them in an insurance agency. As long as he was there, he was simply working there. LaLone had no financial responsibility. If the arrangement had resulted in debt, the Barretts would have paid the debts and would have discharged him. They controlled and directed his activities; they furnished him a place to work; he worked on a definite salary which he drew regardless of profits. Situations such as this are a matter of daily occurrence in the business world. It would require the most tortuous interpretation of the statute and regulation to conclude other than that LaLone was an employee. He had the right to hope that, if the business succeeded, the relationship would ripen into a partnership or joint adventure. That time never came while he was working there.

The motion for summary judgment must be denied.