**WESTERN UNION TEL. CO. v. McCOMB.**

No. 10422.

Circuit Court of Appeals, Sixth Circuit.

Dec. 9, 1947.

Writ of Certiorari Denied March 29, 1948.
See 68 S.Ct. 743.

Charles W. Milner, of Louisville, Ky. (Francis R. Stark and John H. Waters, both of New York City, Charles W. Milner, Hubert T. Willis and B. Hudson Milner, all of Louisville, Ky., of counsel; Bullitt & Middleton, of Louisville, Ky., on the brief), for appellant.

Morton Liftin, of Washington, D. C. (William S. Tyson, Bessie Margolin, Morton Liftin, Sidney S. Berman, and Frederick U. Reel, all of Washington, D. C., and Aaron A. Caghan, Regional Atty., of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, SIMONS and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

On the suit of the Wage and Hour Administrator, the Western Union Telegraph Company was enjoined in the district court from violating the provisions of Sections 6 (a) (4), 7 (a) (3), 11 (c), 15 (a) (2) and 15 (a) (5) of the Fair Labor Standards Act of 1938, Act of June 25,

1938, c. 676, 52 Stat. 1060, U.S.C.A., Title 29, Section 201 et seq., at eight Kentucky towns, namely: Cynthiana, Georgetown, Harrodsburg, Irvine, Morehead, Nicholasville, Paris, and Versailles.

Specifically, the injunction was against employment by Western Union, in the operation of its facilities or equipment in carrying on its telegraph business at the named places, of any persons at a rate less than 40 cents an hour, except when a lower wage rate is authorized by an applicable order of the Administrator issued under section 8 (e) of the act, or when the employees are paid wages authorized by a special certificate issued under section 14 of the act. The company was also enjoined from employing persons at such places for a work-week longer than 40 hours, unless the employee receives compensation for a work-week in excess of 40 hours at a rate not less than one and one-half times the regular rate at which he is employed.

The injunction decree contained a mandate that Western Union shall not fail to make, keep and preserve records of its employees at such places, including all persons suffered and permitted to operate its facilities and equipment in carrying on its telegraph business at the named places, "and of the wages, hours and other conditions and practices of employment maintained by it, as prescribed by the regulations of the Administrator issued, and from time to time amended, pursuant to Section 11(c) of the Act, and found in Title 29, c. V, Code of Federal Regulations, Part 516." The Western Union Telegraph Company has appealed from the injunction decree.

The district court filed comprehensive findings of fact, which are challenged by appellant as clearly erroneous in certain aspects. Upon consideration of the lengthy transcript of evidence in the case, showing in detail the method of conduct of Western Union's business at each of the eight named places, we cannot accept the criticism as well grounded. In our view, the district court set forth without over-expanding minutiae a sufficiency of relevant facts important to decision, and no material discrepancy is disclosed in the findings when checked with the evidence introduced at the trial. The material findings of fact upon which the injunction was issued are certainly not deemed "clearly erroneous." Indeed, the findings are in no significant aspect contrary to the evidence.

As is well known, the Western Union Telegraph Company is now and long has been serving the public with the facilities for interstate and world-wide telegraphic communication. The company's operations include money order transfers; and the telephone, teleprinter and cable, as well as the telegraph, are embraced in its utilities. The present controversy relates to the method of operation of its business in small towns through what are designated as "9A offices." The eight towns here involved fall within that designation; and, in each, the company's business had been formerly transacted by payroll personnel who used its equipment. When the change was made, the telegraph company selected a "9A agent" in each town who, it contends, was an "independent contractor" under the arrangement made. The Administrator denies this contention; and the district court has held that none of these agents was an independent contractor.

Since February, 1944, all arrangements with 9A agencies have been made orally, the use of written contracts having been abandoned. The principal purposes of converting company offices into agency offices were to save money by reducing expenses, mainly wages paid, and to increase revenue by extending hours of service. In inaugurating the new plan, Western Union endeavored to place, under a commission and delivery allowance arrangement, its equipment in a local establishment, preferably a hotel, drug store, bus station, insurance office, or the like. Either the establishment, or some person therein, was carried on the company's records as its agent at the particular place.

The agents chosen by Western Union were appointed so as to procure essential personnel for transacting its communications business at all places covered by the injunction. Company equipment was used in each place in conformity with prescribed standards of service. Such supervision and control as was necessary to that end

was exercised by the company; and, as was found by the district court, "for all practical purposes, other than the direct hiring and firing of personnel employed by the agents and direct payment of salaries to some of such personnel, the Company's relation to the agencies has been and is substantially the same as it was before the conversion was effectuated."

Western Union supplied, installed, inspected, repaired and maintained in these agencies all equipment necessary for handling its telegraphic business. The equipment included teleprinters, typewriters, operating tables, safes, lockers, counters, chairs, fans, stationery, tariff books, forms, supplies, pencils, delivery rules, letters of instruction, and Western Union signs and advertising material: all of which remained the property of the company.

Agency offices are under the immediate supervision of the district superintendent of Western Union, who is assisted by designated managers in the vicinity of the agency offices. The district superintendent and his assistants are instructed by the general manager to supervise and deal with agency offices as if they were company offices.

The district court found that Western Union's plan contemplated, at least for record purposes, that no individual or firm would be designated as its agent unless engaged in some independent enterprise, and that personnel of an agency would spend the greater portion of hours worked in activities other than transacting Western Union business. In practice, this plan was not fully consummated. Although on the records of the company a corporation or partnership was entered as agent, individuals at some places were dealt with as the company's agents and held responsible for the company's business.[1]

In January, 1943, Western Union began making social security and withholding tax returns on individuals and partnerships appearing on its records as agents. Subsequently, the company recognized that expenditures by agents for rent, as well as for certain other items, were deductible from agency earnings and, accordingly, deducted those items before making tax returns on its agents.

The equipment of Western Union at each agency office is connected directly with a relay office under the supervision of a Western Union manager; and no message can be sent or received without passing through the relay office, where each message is audited and a complete record made of every transaction at the agency office. Messages violating Western Union regulations are intercepted.

By either mandatory rules and regulations contained in printed tariffs, delivery manuals, money order manuals, and circular letters of instruction, or through oral instructions, the company has dealt with matters of personnel, hours of work, and details concerning the form, content, receipt, delivery and transmission of mes-

---

[1] "For example, for a number of months Western Union Records show Blue Grass Hotels, Inc., as its agent at Paris, whereas, with the knowledge and at the suggestion of Western Union representatives, the agency had been transferred to and was operated by Mrs. Frances Luallen. In other instances a non-existent business was designated as record agent with the knowledge of Western Union representatives that no such business existed and that the Western Union business at such places was being transacted entirely by one person devoting his entire time thereto. As an example of this practice at Morehead, the agent at one time was purportedly the Elam & Elam Pet Shop, so designated at the suggestion of Western Union representatives, when no such business existed and Mrs. Otis Elam was the agent in fact, devoting her entire time to Western Union business; at another time at Morehead and at the suggestion of Western Union representatives Z. Taylor Young purportedly was engaged in the real estate and feed business while acting as Western Union agent when, in fact, no such business existed. At Versailles for a period of time Western Union records show the Central Kentucky Natural Gas Company and later the Frankfort, Kentucky Natural Gas Company as Western Union agent when, in fact, such companies had no interest in or control over the agency and, with the knowledge of Western Union representatives, all Western Union business was transacted by an individual." (Quotation from Finding of Fact No. IX.)

sages, as well as the rates to be charged and the means to be used in collecting.

Money orders constitute an important part of the business transacted at each agency office. All orders to and from an agency office are handled through a relay office, which exercises supervision over the money-order activities of the agency office. Money orders are paid by drafts drawn on Western Union funds in designated depositories. The personnel in agency offices are authorized to sign these drafts as Western Union representatives. Close supervision over money orders is exercised by the company, the agencies being strictly limited as to the amount of such orders permissible, as well as to the method of payment by the customer.

At each agency, a separate bank account is kept to cover both money order funds and funds received for the transmission and delivery of telegrams. At the expense of Western Union, all persons handling funds at its agencies are placed under bond to the company. Immediate investigation of an agency is made whenever it fails in any respect to observe Western Union's money order regulations.

The credit risk on approved customers is assumed by the company; and, under arrangements made by Western Union with telephone companies, the agencies are permitted to charge messages to telephone numbers.

All bookkeeping and accounting pertaining to agency transactions is done by Western Union at its relay office. The agencies are accountable for charges as computed by the relay offices. All billing and collecting on agency charges and telephone accounts is done by the relay offices. Before the complaint in this case was filed, the agencies were required to transmit their gross receipts to the relay offices, where their commissions and expenses were computed before payment. Since the action was brought, the relay offices compute from company records the net amounts due Western Union, plus taxes, and bill the agencies for the same.

Agency offices are required to furnish telegraphic service for at least the hours published in the company tariffs, as well as for hours on Sundays and holidays required to be observed by Western Union. At some places covered by the injunction, the Western Union agencies have been in establishments which normally did not transact business on Sundays and holidays. Agents and operators are not permitted to reduce the hours of service without company permission.

It is important to observe that the agents involved herein have received commissions on the proceeds from transacting Western Union business, plus delivery allowances. Their earnings depend upon the rate of commission allowed and amount charged for services rendered. This rate is established by Western Union and varies from agency to agency. No messages may be sent or received by the agencies, except such as meet the rules and regulations of the company; and charges for services rendered may neither exceed nor be less than the charges prescribed by Western Union tariffs.

When an agency is established, a Western Union instructor is assigned to teach the personnel at the agency specifically and minutely how to use the Western Union equipment and to give details as to all rules, regulations and routines relating to every phase of the company's business to be transacted at the agency. Tariffs, money-order manuals, rules, regulations and the like are furnished the agents, who are instructed to study and follow them in the transaction of Western Union's business.

Frequent visitorial inspection of the agencies is made by Western Union representatives, to determine whether the company's standards of service are being maintained and to take necessary steps to insure the maintenance of such standards. It was made clear that the company would terminate any agency, the personnel of which persisted in violating Western Union rules and regulations, or engaged in activities detrimental to the telegraph company's public relations.

All complaints, except those of a minor sort, are handled directly by Western Union representatives; and the company as-

sumes full responsibility for damage claims arising out of the transaction of its business at agency offices.

Western Union, through its representatives, was cognizant that certain individual agents did not participate in the transaction of its business and that such agents had employed others as operators. In several instances, where the agents were business establishments, it was known that additional personnel would be required and that working hours would be extended in order to transact the company's business. Relief operators carried on Western Union's payroll have been furnished when required.

Regardless of the particular manner in which an agency conducted Western Union business, operators in each instance were on duty and available to transact the company's business during all hours worked by them. The greater portion of messages and money orders handled at the agencies was sent and received in interstate commerce.

During the period involved herein, the operators of Western Union's facilities and equipment at the places covered by the injunction have worked regularly in excess of 40 hours per week. At some of the places, persons engaged in transacting Western Union's business were paid wages at a rate less than 40 cents an hour.

In concluding portions of its 31 numbered findings, the district court found, upon supporting evidence, that in some instances the wages of the operator were paid by the person or establishment recorded as agent; in some instances, with the knowledge of Western Union representatives, the commission and expense checks issued in the name of the recorded agent have been endorsed by him and turned over to the operator; in other instances such checks have been issued by Western Union directly to the individual operator, who was also the record agent.

The district court found that, except at Paris and Morehead, all persons engaged at Western Union agency offices covered by the complaint in the case received for their services only agreed weekly salaries or stipulated commissions, none being compensated for hours worked in excess of 40 dur-

ing a work-week at a rate not less than one and one-half times the regular rate at which he was employed.

The district court found further that, in many instances, records as to hours worked, wages paid, and other conditions and practices of employment as required by regulations issued by the Administrator of the Wage and Hour Division, pursuant to Section 11(c) of the Fair Labor Standards Act, have not been kept with respect to persons engaged at the places covered by the injunction in operating the facilities and equipment and transacting the business of the Western Union Telegraph Company.

The telegraph company contends that it may in good faith utilize the services of an independent contractor within the meaning of the Fair Labor Standards Act; that its 9A agents are independent contractors; and that their employees are not, in fact, the employees of the telegraph company. Walling v. Sanders, 6 Cir., 136 F.2d 78, 81, is emphasized as authority for appellant's insistence. The facts of that case are plainly differentiable from those encountered here. There, it was held that the mere fact that a wholesale distributor of beer permitted his salesmen to hire and pay out of their compensation from him drivers to help them deliver beer to retailers in trucks owned by the distributor and pick up empty cases and bottles for return to the warehouse did not, under the Fair Labor Standards Act, constitute the drivers employees of the distributor. The crucial fact in evidence was that the salesmen exercised complete control over the drivers. The wholesale distributor had no control whatever over them. On the contrary, Western Union exercised full control over the manner in which its business was to be conducted at 9A agencies.

Walling v. American Needlecrafts, 6 Cir., 139 F.2d 60, is a guidepost to decision in the instant controversy. In that case, it appears that expert craftsmanship in needlework on bedspreads, comforters, pillow slips, robes, housecoats, and articles of a kindred nature, had been passed by women in the same vicinity from one generation to another. A manufacturing company purchased in New York and sent to

its Kentucky studios cut and stamped designs for required needlework. This material was delivered in convenient bundles by the studios in Kentucky to homeworkers who were wives, widows and daughters of farmers. Most of these women, at odd times as their family duties and housework would permit, did the needlework for which their craftsmanship had well equipped them. Their work was paid for on a piece basis when the goods were returned by them to the studios. For further details of the facts, the carefully prepared opinion of Judge Simons, who also wrote the opinion for this court in Walling v. Sanders, supra, should be consulted

The company insisted that these homeworkers were not employees as defined in the Fair Labor Standards Act, but were independent contractors. This contention was rejected and it was held that the women homeworkers, even though not supervised in their work and even though they furnished their own tools, such as frames, clamps, thimbles and needles, and determined their own hours of employment, came within the coverage of the Fair Labor Standards Act. The opinion pointed out the principle that the act is designed to implement a public social, or economic policy through remedies unknown to and often in derogation of the common law; and that in the status of the case the court was not concerned with the question of whether a master-servant relationship existed under otherwise applicable rules of the common law. [See National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 129, 64 S.Ct. 851, 88 L.Ed. 1170.]

In discussing the opinion in Bowman v. Pace Company, 5 Cir., 119 F.2d 858, 860, upon which appellant places much stress, our court thus quoted the language of that authority: "It is not the purpose of the Fair Labor Standards Act to create new wage liabilities, but where a wage liability exists, to measure it by the standards fixed by law." We pointed out that this statement of principle is, however, illuminated by the illustration which the Fifth Circuit Court of Appeals gave immediately after its quoted statement: "If one has not hired another expressly, nor suffered or permit-

ted him to work under circumstances where an obligation to pay him will be implied, they are not employer and employee under the Act." We asserted that there would seem to follow from this negation an affirmation that if one does suffer or permit another to work under circumstances where an obligation to pay him will be implied, they are employer and employee under the act.

Citing the opinion of this court in Walling v. American Needlecrafts, supra, and of the Supreme Court in Guiseppi v. Walling [decided with Gemsco v. Walling], 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921, to the effect that homeworkers had been held to be employees within the definitions of employer and employee in the Fair Labor Standards Act, the Court of Appeals for the Second Circuit rejected the argument that outside tailors, in the circumstances of the case, should be excluded from coverage of the act because they were free from supervision, were at liberty to work or not as they chose, and might work for other employers if they wished. The tailors involved did work for a corporation, received regular stipends from it to cover expenses for maintaining their shops in which their work was done; employed apprentices and others to help them do various incidental jobs, and sometimes even shared shops with one another. An injunction against the violation by the corporation of section 15 (a) (1), (a) (2), and (a) (5) of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., was affirmed. Walling v. Twyeffort, Inc., 2 Cir., 158 F.2d 944.

Appellant cites Walling v. Nashville, C. & St. L. Ry., 6 Cir., 155 F.2d 1016, affirmed 330 U.S. 158, 67 S.Ct. 644. But that case has no present bearing for it held merely that where a railroad company, without exercising authority or control over their activities, permitted trainees to use its facilities during their training period, the trainees were not working for the benefit of the company and were not its employees within the protection of the Fair Labor Standards Act. Likewise, Walling v. Portland Terminal Co., 330 U.S. 148, 67 S.Ct. 639, held that trainees for work as yard brakeman, whose work did not expedite the

railroad's business but sometimes actually impeded and retarded it, were not employees within the meaning of the Fair Labor Standards Act.

Another opinion of this court cited by appellant, Glenn v. Standard Oil Co., 6 Cir., 148 F.2d 51, 53, 55 adds no strength to its position. There, commission agents operating an oil company's bulk distributing plants were held to be independent contractors and not employees within the scope of the Social Security Act. But it was made clear that an independent contractor is one who has contracted to do the work undertaken "according to his own methods, and without being subject to the control of his employer, except as to the result of his work." On the facts of the case, there was found no reservation of control on the part of the oil company over the methods and means employed by the agents in carrying out the business of selling the company's products. As has been shown, the evidence in the instant case proves that the Western Union Telegraph Company controlled the methods and means used by its 9A agents in the transaction of the company's public service business.

Certainly, workers in an agency office of the telegraph company are not withdrawn from coverage of the Fair Labor Standards Act for the reason that some of them are engaged in local retailing work in addition to telegraphic work, or because of the location of the telegraph office in a retail or service establishment. See discussion in Roland Electrical Co. v. Walling, 326 U.S. 657, 666, et seq., 66 S.Ct. 413, 90 L.Ed. 383; and in Sun Pub. Co. v. Walling, 6 Cir., 140 F.2d 445, 448, wherein we pointed out that public utilities or public service corporations are not exempted by section 13(a) (2) of the act. Cf. Schmidt v. Peoples Telephone Union of Maryville, Mo., 8 Cir., 138 F.2d 13; New Mexico Public Service Co. v. Engel, 10 Cir., 145 F.2d 636; Reynolds et al. v. Salt River Valley Water Users Ass'n, 9 Cir., 143 F.2d 863.

In Wabash Radio Corp. v. Walling, 6 Cir., 162 F.2d 391, 393, 394, this court after setting forth the facts of the case, unnecessary to be reiterated, called attention to the holdings in Walling v. Connecticut Co., 2 Cir., 154 F.2d 552, and Davis v. Goodman Lumber Co., 4 Cir., 133 F.2d 52, that when an exempt employer engages in activities different from those exempted, the employees in the non-exempt department of his business are subject to the act. Guess v. Montague, 4 Cir., 140 F.2d 500, was cited to the effect that where the exempt and non-exempt characteristics of a business are so intermingled as to be inseparable, the exemption is denied entirely. The assertion was made that a similar situation was presented when employees of a radio corporation wholly owned by a common carrier were "available every minute of the day to the public." [162 F.2d 394.] In the course of the opinion, Boutell v. Walling, 327 U.S. 463, 66 S.Ct. 631, 90 L.Ed. 786 (to which much importance is attached by appellant), was discussed. Under the authority of that case, it was considered immaterial that work performed by the employees of the radio corporation was of very heavy proportionate benefit to the parent railroad company. It was pointed out that the Boutell case held that employees of the non-exempt service company fell within the coverage of the Fair Labor Standards Act. The Boutell case permits no logical deduction that persons who do the work of the telegraph company at local 9A agencies, in addition to performing unrelated duties for their employer, are exempt from the act.

On June 16, 1947, the Supreme Court promulgated two opinions which, in our judgment, impel the conclusion that, to conform with their rationale, we must hold in this case that the Wage and Hour Administrator is entitled to the injunctive relief granted by the district court. See United States v. Silk (Harrison, Collector of Internal Revenue v. Greyvan Lines, Inc.), 331 U.S. 704, 67 S.Ct. 1463, and Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473.

In the Silk and Greyvan cases, involving employment taxes under the Social Security Act, 42 U.S.C.A. § 301 et seq., the Supreme Court stated at the outset that both cases turned on a determination as to whether the workers concerned were em-

ployees or independent contractors under the act. It was asserted that the same rules were applicable which had been applied to the National Labor Relations Act in National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, the principles of which were restated. For brevity's sake, the facts of the cases will not be set forth in detail. It was held that unloaders of coal who provide their own tools, work only when they choose, and are paid an agreed price to unload coal from railroad cars, were "employees" within the meaning of the Social Security Act; but that truck-drivers who own their own trucks, pay their expenses of operation, employ and pay their own helpers, and receive compensation on a piece work or percentage basis, were independent contractors rather than "employees" within the meaning of the act. The opinion asserts that factors regarded as important in the determination of whether a worker is an employee or an independent contractor are, among others, the right to control how work shall be done, the degree of control, investment in facilities, opportunities for profit or loss, permanency of relation, and skill required in claimed independent operation. The court stated that no one of these factors is controlling, "nor is the list complete." [331 U.S. 704, 67 S.Ct. 1469.] It was made plain that, to draw distinctions, the total situation must be taken into view.

In Rutherford Food Corp. v. McComb, supra, it was emphasized that, in applying the provisions of the Fair Labor Standards Act, the determination of whether a relationship is that of independent contractor or employee does not depend upon isolated factors, "but rather upon the circumstances of the whole activity." [331 U.S. 722, 67 S.Ct. 1477] In characterizing the work of boners in a slaughterhouse as part of the integrated unit of production so as to classify them as employees of the establishment, the Supreme Court said: "Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act." In support of this statement, the Supreme Court cited in a footnote Walling v. American Needlecrafts, supra; Walling v. Twyeffort, Inc., supra; and United States v. Vogue, Inc., 4 Cir., 145 F.2d 609.

Appellant relies heavily upon Blankenship v. Western Union Tel. Co., 4 Cir., 161 F. 2d 168, as authoritative in support of its argument. In that case, a partnership operating a hotel in a town in West Virginia made a contract with Western Union Telegraph Company to establish and maintain a branch office of the company in its hotel for a percentage of charges on telegrams. The Court of Appeals held, first, that the Fair Labor Standards Act does not apply to a partnership; and, further, that the partners were independent contractors and not employees within the inclusion of the act.

The case had come to the Court of Appeals in an unusual course. An action had been instituted by the partners for a declaratory judgment that they were employees of Western Union and, as such, were entitled to the benefits of the Fair Labor Standards Act. The appellate court had before it, on the employment question, only the contract, the complaint and the motion of Western Union to dismiss. The circumstances of the whole activity were, therefore, not comprehensively presented. Moreover, the Wage and Hour Administrator was not a party to the action, and had no opportunity to introduce evidence or to urge his position from the standpoint of an expert in the administration of the act.

We will not lengthen this opinion by setting forth the consideration from which the court drew its conclusions. With due deference, we are not in accord with the reasoning of the Blankenship case and think that the decision is not in consonance with the rationale of the Silk and Greyvan, and Rutherford cases, supra, which were decided later. Moreover, we think the case out of line with other opinions which have heretofore been discussed or cited; among others, our own opinion in the American Needlecrafts case, supra.

It should be borne in mind constantly that the provisions of the Fair Labor Standards Act granting exemptions from the operation of the act are to be narrowly construed. See *Phillips Co. v. Walling,*

324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L. Ed. 1095, 157 A.L.R. 876, where the Supreme Court said: "To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people."

The power of the district court in its sound discretion to issue an injunction in a case of this character is too well established to require the citation of authority. But see, for instances, Rutherford Food Corp. v. McComb, supra; Walling v. Twyeffort, Inc., supra; and Walling v. American Needlecrafts, supra. The appellant vigorously asserts its right to continue the practices which have been enjoined. This not only justifies, but necessitates, the injunctive process as the only practical and adequate remedy to protect the rights of the employees here involved.

In a supplemental brief, appellant argues that it is not obligated to employees of 9A agencies under the Fair Labor Standards Act of 1938, as amended by the Portal-to-Portal Act approved May 14, 1947, Public Law 49, 80th Congress, chapter 52, first session, H.R. 2157, 29 U.S.C.A. § 251 et seq.; and that, in consequence of the enactment of the Portal-to-Portal Act, the courts have no jurisdiction in this action to enjoin the Western Union Telegraph Company "with respect to employees of 9A agents."

We think the Portal-to-Portal Act of 1947 has no bearing here. The underlying reason for its enactment was to foreclose myriads of suits demanding some six billion dollars as compensation for "walking time" and the like, brought in pursuance of the doctrine announced by the Supreme Court in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515, reversing the opinion of this court, reported in 6 Cir., 149 F.2d 461. In the instant action, the purpose of the Wage and Hour Administrator is to prevent, by injunctive process, Western Union from violating sections of the Fair Labor Standards Act which have not been changed by the Portal-to-Portal Act. There is no indication in the Portal-to-Portal Act that Congress intended to modify the scope of employment under the Fair Labor Standards Act. Indeed, section 13(a) of the later law expressly provides that the terms "employer" and "employee," when used in relation to the Fair Labor Standards Act, shall have the same meaning as when used in that act.

From its legislative history, as well as from the language of the statute, there is no apparent purpose revealed in the Portal-to-Portal Act to enable an employer to shift liability under the Fair Labor Standards Act for compensable activities of its employees by adoption of any sort of independent contractor device. Section 2 of the Portal-to-Portal Act of 1947 has no applicability, for the reason that the Wage and Hour Administrator is not seeking to subject an employer "to any liability or punishment" under the Fair Labor Standards Act, but is seeking to prevent future violations of the act, which he has a plain right to do.

The judgment of the district court is affirmed.