FLEMING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. DEMERITT CO.

No. 293.

District Court, D. Vermont.

July 11, 1944.

Douglas B. Maggs, Sol., and Archibald Cox, Associate Sol., both of Washington, D. C., George H. Foley, Jr., Regional Atty., of Boston, Mass., and Morris E. Yaraus, Atty. U. S. Department of Labor, of Woonsocket, R. I., for plaintiff.

Guy M. Page, of Burlington, Vt., for defendant.

LEAMY, District Judge.

This is a civil action brought by the Administrator of the Wage and Hour Division, United States Department of Labor, under Section 17 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., in which judgment is sought to enjoin and restrain the defendant manufacturing company from violating Sections 15 (a) (1), 15 (a) (2), and 15 (a) (5) of the Act.

The parties have filed a Stipulation of Facts which is adopted as the findings of the Court, and which, for the purposes of this opinion, may be summarized as follows:

The defendant is a Vermont corporation with its manufacturing plant located at Waterbury, Vermont. It is engaged in the manufacture of "hold-fast spring clothespins" for sale in interstate commerce. It also conducts a retail lumber business and during the proper season is also engaged in the canning business. The clothespin manufactured by the defendant is the conventional type of "snap spring clothespin", consisting of a coil spring and two pieces of wood held together by the spring. The cutting out and molding of the wood and the shaping of the springs are done in the defendant's factory building, but the assembling of the wood and the springs into the clothespins and the packing of the pins, is not done in the defendant's factory but is done by approximately 47 homeworkers to whom this work is regularly delivered in their homes. In most instances the assembling operations are performed by the homeworkers on machines owned, supplied and repaired by the defendant, although in four instances the machines are owned by the homeworker. The assembling operation is simple and calls for no special skill or supervision. It consists in dropping two pieces of wood and the spring into the top of the machine, pressing a foot lever and picking out the pin. The company owns about fifty of these machines. None of them is used in the factory. They are furnished free to the homeworkers and if repairs are necessary the company calls for them and repairs them free in the factory. The work done by the homeworkers could be done at the factory with no change in the material, equipment or labor. In some cases work is distributed to two or more persons in the same household, while in other cases one or more persons in the same household, besides the one to whom the work was distributed have performed work, and in some homes two machines have been placed by the company to facilitate the doing of the work. After the pins are made they are packed by the homeworkers. This consists of placing 18 or 24 pins in a cardboard folder supplied by the company. The cardboard is folded over and this makes the package. Packing is also done on sticks to which the pins are attached. A stick may carry 9 or 12 pins and two sticks make up a unit. The company notifies the homeworker, by printed instructions on the case, whether the pins are to be made up in bulk or are to be packaged. The company leaves with the homeworkers either folders or sticks for the homeworker to pack the pins. If folders or packing pins are left with the materials, the homeworkers pack the pins after assembly. If the cases are simply marked "bulk" and there is nothing to pack them on, then the pins are assembled with no packing. The company delivers the materials to the homeworker, and collects the finished products from them, without expense to the homeworker. Shipment to the trade is made by the company from its factory. There are no seasonal periods in the clothespin business and production is steady throughout the year. Deliveries to the homeworkers are usually in lots of 10 cases with 12 gross or 1728 pins to the case. Sometimes 20 case lots are delivered. It is the practice to leave 10 cases to be worked on when 10 cases of completed pins are being called for by the company. In some instances a specified time for completion is requested by the company at the time the work is left with the homeworker. If the latter cannot comply, it is taken to another homeworker who can. No other materials except those furnished by the company are necessary to produce a finished clothespin. The homeworker suffers no expense of any kind and except in the four instances where they own the machines) furnishes only the labor necessary to assemble or to assemble and pack. The company has the power to initiate, continue or discontinue at anytime the distribution of the homework to any homeworker. The homeworker has no written contract with the company and no voice in determining the piece rate for the work. The piece rate as fixed by the company in recent years has varied from 3½ cents to 4 cents a gross for assembling, and from 4 cents to 5 cents for assembling and

packing. At a given time all homeworkers have always received the same price. The homeworkers do not assemble or pack clothespins for other concerns. Competitors in Vermont of the defendant company have the assembling and packing operations performed in their factories. Many of the homeworkers worked in the defendant's plant during the canning season and some of them not only did homework on the clothespins but during the same workweek, worked in the plant in canning operations. This homework however was largely confined to unfinished work on hand, as the company distributed and collected little homework during the canning season. The defendant started the homework system at the commencement of its business about 40 years ago when it did not have factory room so that it could do the work there. Many of its homeworkers have made pins for many years. Several of them have done so for over 20 years. As the business developed, several physically handicapped persons who would not have otherwise been able to earn money, became and continued as homeworkers. Many others are those, who because of home ties and duties were not able to work outside their home, but have some free time at home. There is no other homework done in the community. The company has the right to refuse to give out work unless the person taking it agrees to complete it at a stated time. With the general instructions as to packing, etc., mentioned above, the homeworkers are free to work at such times, at such operation whether assembling or packing, and in such manner as they desire, free from direct supervision by the company. There is no requirement or condition imposed that the work shall be done personally by those to whom it is given out. Most of the homeworkers receive assistance from other members of the household and occasionally from other persons who may happen to be visiting the house where the work is being done. In these respects the company holds the homeworker responsible only for the production of a proper finished product. In some cases the homeworkers secure the work from the company to be done by others in the same household than the person dealing directly with the company and paid by it. In making the original arrangement for distribution of the homework to a homeworker, the company inquires as to the status of the homeworker with reference to the number of people in the household, financial circumstances and other

matters. When picking up the completed homework, the company representative does not ask which individuals within the household did the work. From personal observation or statements made to him, he knows in most instances in which households two or more members of the family group regularly work in assembling and packing pins. When the pins are picked up by the company, they may be (a) in bulk unpacked or (b) packed on sticks carrying nine or twelve pins with two sticks making a unit, or (c) packed in a cardboard package. The latter are ready for shipment. The pins on sticks are wrapped in cellophane at the factory and are then ready for shipment. The pins in bulk are counted by weighing them on computing scales. The bulk pins are shipped out in the same container in which they were placed by the homeworker.

Discussion and Conclusions of Law.

The defense is, that since there is no supervisory control over the manner in which, or the time when the work was to be done by the homeworkers and the apparent absence of power in the company to terminate employment before completion, that the homeworkers are not employees within the meaning of the Act, but are independent contractors and so not covered. The Administrator contends (1) that the statutory language and legislative history of the Act clearly establish that the homeworkers are within its scope and (2) that they are also employees within the usually accepted concept of the employment relation.

■ Since the decision of the United States Supreme Court in National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 856, it is settled that the test to be applied in the determination of the question here at issue is not the traditional test of the employee relationship at common law, influenced by control of physical conduct in the performance of the service, but whether or not the employee relationship exists in the light of the history, terms and purposes of the legislation.

In the Hearst case which determined whether or not certain newsboys were "employees" within the meaning and intent of the National Labor Relations Act, while discussing the results which would follow from the application of common law principles the Court said: "It would introduce variations into the statute's operation as wide as the differences the forty-eight

states and other local jurisdictions make in applying the distinction for wholly different purposes. Persons who might be 'employees' in one state would be 'independent contractors' in another. They would be within or without the statute's protection depending not on whether their situation falls factually within the ambit Congress had in mind, but upon the accidents of the location of their work and the attitude of the particular local jurisdiction in casting doubtful cases one way or the other. Persons working across state lines might fall in one class or the other, possibly both, depending on whether the Board and the courts would be required to give effect to the law of one state or of the adjoining one, or to that of each in relation to the portion of the work done within its borders. Both the terms and the purposes of the statute, as well as the legislative history, show that Congress had in mind no such patchwork plan for securing freedom of employees' organization and of collective bargaining. The Wagner Act is federal legislation, administered by a national agency, intended to solve a national problem on a national scale. Cf. e. g., Sen. Rep. No. 573, 74th Cong., 1st Sess. 2–4. It is an Act, therefore, in reference to which it is not only proper, but necessary for us to assume, 'in the absence of a plain indication to the contrary, that Congress * * * is not making the application of the federal act dependent on state law.' Jerome v. United States, 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640. Nothing in the statute's background, history, terms or purposes indicates its scope is to be limited by such varying local conceptions, either statutory or judicial, or that it is to be administered in accordance with whatever different standards the respective states may see fit to adopt for the disposition of unrelated, local problems. Consequently, so far as the meaning of 'employee' in this statute is concerned, 'the federal law must prevail no matter what name is given to the interest or right by state law.' Morgan v. Commissioner, 309 U.S. 78, 81, 626, 60 S. Ct. 424, 426, 84 L.Ed. 585, 1035; cf. National Labor Relations Board v. Blount, 8 Cir., 131 F.2d 585."

And again the Court said: "Whether, given the intended national uniformity, the term 'employee' includes such workers as these newsboys must be answered primarily from the history, terms and purposes of the legislation. The word 'is not treated by Congress as a word of art having a definite meaning * * *.' Rather 'it takes color from its surroundings * * * (in) the statute where it appears,' United States v. American Trucking Ass'n, Inc., 310 U.S. 534, 545, 60 S.Ct. 1059, 1065, 84 L.Ed. 1345, and derives meaning from the context of that statute, which 'must be read in the light of the mischief to be corrected and the end to be attained.'" (Citations omitted.)

In its discussion of the scope of the Act the Court said: "In short, when the particular situation of employment combines these characteristics, so that the economic facts of the relation make it more nearly one of employment than of independent business enterprise with respect to the ends sought to be accomplished by the legislation, those characteristics may outweigh technical legal classification for purposes unrelated to the statute's objectives and bring the relation within its protections."

In Walling v. American Needlecrafts, Inc., 46 F.Supp. 16, the District Court for the Western District of Kentucky held that homeworkers, of the type here in question, were not employees either at common law nor under the statutory definition thereof, basing its conclusion upon the lack of supervisory control over the manner in which, or the time when the work was to be done by the homeworkers, and the absence of power reserved or exercised by the company to terminate employment before completion of the work and also upon the inference that the Congress in enacting the Fair Labor Standards Act did not intend to destroy long-established rules affecting the relationship of employer and employee.

In reversing the case, 139 F.2d 60, 63, the Circuit Court of Appeals, Sixth Circuit, said: "It will avail us little to consider whether the master-servant relationship existed between the appellee and its homeworkers under the common law, and we may assume that the well-considered opinion of the District Judge was, in that respect, sound, even though there are cases, both state and federal, which hold that an employer-employee status may exist when there is no continuous supervision over the work if there is such supervision as the nature of the work requires. Our decision in Western Express Company v. Smeltzer, 6 Cir., 88 F.2d 94, 112 A.L.R. 74, is sufficiently illustrative of such line of authority. We are dealing, however, with a specific statute which, like the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., is

of a class of regulatory statutes designed to implement a public, social, or economic policy through remedies not only unknown to the common law but often in derogation of it. N. L. R. B. v. Colten, 6 Cir., 105 F. 2d 179; Agwilines, Inc., v. N. L. R. B., 5 Cir., 87 F.2d 146, 150, 151; Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38. If the act presently considered, expressly or by necessary implication, brings within the scope of its remedial and regulatory provisions, workers in the status here involved, we are not concerned with the question whether a master-servant relationship exists under otherwise applicable rules of the common law."

█ The question then for determination is whether or not the defendant's homeworkers are "employees" in the light of the history, terms and purposes of the Act.

The purposes of the Act are set out in the preamble, 29 U.S.C.A. § 202, wherein Congress finds "that the existence, in industries engaged in commerce * * * of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce" and declares it to be the policy of the Act "to correct and as rapidly as practicable to eliminate the conditions above referred to * * *."

Section 203 of the Act provides:

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *.

"(e) 'Employee' includes any individual employed by an employer. * * *

"(g) 'Employ' includes to suffer or permit to work."

In addition to the broad definition of "employ" in Section 203 as including "to suffer or permit to work", Section 206(a) (5) specifically refers to homeworkers as employees. Thus a relaxation by the Administrator of the statutory standards in Puerto Rico and the Virgin Islands is authorized "if such employee is a homeworker," and the administrator may "define any operation or occupation which is performed by such homework employees" to facilitate this function. It is apparent, then, that in enacting Section 206(a) (5),. Congress considered ordinary industrial homeworkers to be employees. This assumption, no doubt, was premised upon the evident intent to include homeworkers within the scope of the Act as originally enacted. The consideration of earlier drafts of the wage-hour legislation, the Act as finally adopted, and proposed amendments after its enactment, results in the firm conclusion that Congress intended to extend the benefits of the Act to industrial homeworkers of the type here involved.

The original Black-Connery bill which provided for a wage and hour Board to determine appropriate wage rates, issue wage orders and secure their enforcement, after defining the term "employee", declared in Section 6(a):

"* * * The Board shall have power to define by regulation or order the method of computing and determining the number of employees employed by any employer to prevent the circumvention of the Act or any of its provisions through the use of agents, independent contractors, subsidiary or controlled companies, *or home or off-premise employees,* or by any other means or devise." (Italics supplied.)

The then Assistant Attorney General (now Mr. Justice) Jackson testified that the bill was clearly designed to authorize control over industrial homework practices. In the hearings before the Senate Committee (Joint Hearings before the Senate Committee on Education and Labor and the House Committee on Labor on S. 2475 and H.R. 7200, 75 Cong. 1st Sess., 1937, p. 77). he stated that "the factory which sends out and makes use of people in their homes are not exempted just because they are using premises they do not pay rent for." And Congressman Fitzgerald indicated the intention to cover homework: "The employer in the same line of business who maintains a factory, decent working conditions for his workers, pays taxes, and is otherwise an asset to the community is at a great competitive disadvantage in competing with those employers whose production is confined to industrial home work." 81 Cong.Rec.Appx. 2136 (1937).

The Senate Committee which reported the bill on July 8, 1937, accomplished the purposes of Section 6(a) as quoted above, by merging that section in an expanded definition of "employee." The words "suffered or permitted to work," then introduced for the first time, were unquestionably designed to comprehend all the classes of relationship which previously had been designated individually, and regarded as likely means for attempts at circumvention of the Act. Thus in its report accompanying the bill, the Committee pointed out that it had revised the definition "to include *all* employees with the exception of persons employed in a bona-fide executive * * * capacity." (Italics supplied.) S.Rept. 884, 75th Cong., 1st Sess. (1937), p. 6. Senator (now Mr. Justice) Black referred to this language as "the broadest definition that has ever been included in any one act." 81 Cong.Rec. 7657.

Subsequent to its enactment, Congress furnished additional evidence of its original intention to include homeworkers under the Act. Both the offer and the rejection of amendments relating to homeworkers were predicated on the premise that homeworkers, whether urban or rural, were within the existing coverage provisions. Several bills introduced in the House during 1939 proposed that Section 14 of the Act, 29 U.S.C.A. § 214, should be amended to authorize the Administrator specifically to permit the employment of *rural* homeworkers at wage rates lower than the statutory minimum. The first Norton Bill H.R. 5435, the second Norton Bill H.R. 6406, the Barden Bill H.R. 7133 and the Ramspeck Bill H.R. 7349 were almost identical in their proposal for the amendment of Section 14 as follows: "The Administrator shall promulgate regulations permitting the employment, in rural areas, of employees in the home at such wages lower than the minimum wage applicable under section 6, and containing such provisions governing the piece rate to be paid, the time of day during which such work shall be performed, and such other provisions, as the Administrator may prescribe * * *."

Certainly, such an amendment was unnecessary unless the existing Act was applicable to home workers. In the discussions which ensued, the statute in its present form was uniformly acknowledged to bar rural homework at rates of pay lower than the minimum wage provisions. The House Committee on Labor, which had charge of the Fair Labor Standards Act while it was pending in Congress, in its report accompanying the proposed amendment for homeworkers stated: "The Act at the present time treats homeworkers just as any other type of employee." H.R. 522, April 27, 1939, p. 10.

During the discussions it was argued that the proposed amendments would restore to rural people additional income which they could earn from industrial homework if the wage and hour requirements were lifted (86 Cong.Rec. 4924, 5122). But the amendments were finally rejected under the theory that the economic evils which the Act prohibited should not be restored and that the original legislative intent to include industrial homeworkers within the scope of the Act was in every respect sound.

This legislative history is compelling evidence of the original and, thus far, continuing intention of Congress to include industrial homeworkers within the scope of the Act.

Therefore without determining whether all homeworkers come within the scope of the Act, I am compelled, by the legislative history, the terms and the purposes of the Act, to conclude that the homeworkers here considered are within its protection.

Judgment for the plaintiff.

Counsel will tender order for entry in accordance with the above ruling.