## McCOMB v. EDWARD S. WAGNER CO., Inc., et al.

### Civ. No. 8847.

United States District Court
E. D. New York.

Jan. 25, 1950.

John A. Hughes, Regional Attorney, U. S. Department of Labor, New York City, C. Ira Funston, Supervising Attorney, Washington, D. C., for plaintiff.

Benjamin L. Lasky, Brooklyn, N. Y., and Charles M. Joseph, New York City, for defendants.

KENNEDY, District Judge.

This is a suit for a permanent injunction. The defendants are charged with violation of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

Some explanation ought to be made of the condition of the record of the trial. At preliminary discussions between counsel

and the court it seemed to be obvious that the underlying facts were substantially undisputed. Depositions had been taken in the case, and a good deal of documentary evidence collected. But at the time of the trial, I thought, and I still think, that it was perfectly possible for counsel to stipulate all the operative facts. However, as is often the case, each side was desirous of stressing some factual elements and minimizing others, and there ensued a long rambling discussion between counsel and the court. The upshot of this discussion was not a stipulation, as had been hoped, but the introduction of the evidence.

What follows is my own skeletonized summary of the facts, as established, not only by the evidence but by the unchallenged statements of counsel. Edward S. Wagner Co., Inc. (hereafter called Wagner, at least as to matters occurring after 1940) is a distributor of infants' wear. Its line of goods consists of bootees, caps and sacques (or sets of these). The individual defendant Wagner dominates and controls the corporation (references to "Wagner" include the individual). Wagner has been in the same business since 1937. Prior to October 1938 business was transacted in the name of E. S. Wagner Company (a trade-name). There was, however, an affiliate called Flagstaff Knitting Mills (which was also a trade-name). The business was financed by a man named Meyers, now dead, and Wagner's role was that of employee, managing agent, or managing partner—it does not much matter which, for present purposes. Through Flagstaff Knitting Mills, prior to October 1938, the enterprise employed home workers who were paid at a piecework rate. These home workers were furnished with designs, samples, patterns and instructions by Flagstaff, and their product was distributed through E. S. Wagner Company. At or shortly before the effective date of the Fair Labor Standards Act, Wagner notified all the home workers that it was no longer possible that they be compensated as such, and that they must return the materials on hand, which was done. However, some of these persons continued to supply the same goods, either on the invitation of Wagner or in the hope that he would buy them. In November 1939 the Wagner Corporation was organized but it did not actually begin operations until April 1940. In the interval Meyers died and Wagner purchased his interest. Between 1939 and 1948 the number of suppliers (i. e., persons who knitted the products at home), who at one time or another furnished goods, had reached a figure of about 3,000. This is not to say that there were 3,000 persons continuously supplying Wagner with goods: as might be expected, some of them from time to time ceased production or sold their goods elsewhere. In the year 1948, for example, 1,105 persons supplied goods. They resided in 14 different states—principally in New England—and they sent in 3,437 packages (9,282 dozen); 227 were new suppliers who had no earlier contact with the Wagner Corporation, or with Wagner. All of these persons paid for their own yarn and paid the parcel post charges. Although most of the suppliers bought their yarn at one source, that fact is probably irrelevant, because concededly there was no relationship between Wagner and any yarn manufacturer in the way of facilitating credit arrangements or in discharging any of the obligations of Wagner suppliers to yarn manufacturers. It is generally true that Wagner did not purchase all of the material sent in; in fact, the percentage of rejections was very high, probably amounting to two-thirds of the number of packages received. I have previously mentioned that Wagner did not furnish designs. It did from time to time suggest to suppliers that the yarn used by that particular person was unacceptable and of course from time to time it told suppliers that the design followed by that supplier was not what was wanted and made suggestions concerning how it could be improved.

Enough has been said at this point to foreshadow what the controversy is about. The plaintiff administrator takes the position that those who supply defendants with goods are under the coverage of the Fair Labor Standards Act; Wagner Corporation and Wagner himself urge that they

are not employees, but independent contractors.

It is not surprising that very soon after the enactment of several types of social legislation the same thought occurred to many lawyers who were advising business men: that it might be possible to remove from the coverage of the act large numbers of persons connected with any particular business, if those persons could be given the common-law status of "independent contractors". But in every instance Congress had wisely framed such legislation in language which negatived the idea that the word "employ" was used in the common-law sense. Thus it happened that newsboys were held to be employees so far as labor relations were concerned, National Labor Relations Board v. Hearst Publications, 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, and that coal unloaders who worked only casually were nevertheless employees for purposes of social security. U. S. v. Silk, 1946, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757. Dealing with the very act here under consideration, Judge Frank says, (Walling v. Twyeffort, Inc., 2 Cir., 1947, 158 F.2d 944, 947, 948): "Drawing the line between employees and independent contractors cannot be done mechanically; it calls for rational judgment as the facts vary, but that need not terrify us".

Of course industries which employ persons working at home have provided fertile fields for debate concerning the line of distinction between independent contractors and employees spoken of by Judge Frank, e. g., Walling v. American Needlecrafts, 6 Cir., 1943, 139 F.2d 60; Walling v. Wolff, D.C.E.D.N.Y.1945, 63 F.Supp. 605. But the Fair Labor Standards Act uses a definition of the word "employ" which, according to Mr. Justice Black (then a Senator) "is the broadest definition that has ever been included in any one Act". 81 Cong.Rec. 7657.

The plaintiff in this case suggests that the rationale of all the cases already mentioned, as well as that of Rutherford Food Corp. v. McComb, 1947, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772, supplies six tests which are useful in the determination of the nature of the relationship between the employer and the supplier or worker:

(1) Is the service rendered an integral part of the employer's business?

(2) What is the extent of the so-called contractor's investments in facilities and equipment?

(3) Is the relationship characterized by permanency and long duration?

(4) To what extent does the principal exercise control over the individual whose status is in question?

(5) What opportunity does the so-called contractor have for profit or loss as the result of sound management or risk undertaken?

(6) What amount of initiative judgment and energy is required for the success of the enterprise which is claimed to be independent?

It would be very unwise to say that these are all the tests that can be used, or to say that any particular one is controlling, or that a majority of negative or affirmative answers, as the case may be, will furnish the solution. To do this would be to draw the line "mechanically", but a consideration of each one of these questions separately will at least serve to narrow the dispute.

In the case at bar there is no question at all that those who supply Wagner products are an integral part of the business. Nor is there any doubt that the investment in facilities and equipment on the part of these suppliers is negligible in amount. Again, the opportunity for profit or loss arising from sound management, or the risk undertaken is negligible or nearly so. The suppliers in this case, as in the case of ordinary pieceworkers under the coverage of the act will be compensated in proportion not to their sound management but to the number of pieces they turn out, because they must take Wagner's price or leave it. And for the same reason initiative, judgment, and energy play a very minor role in the "enterprise" which the suppliers conduct.

This leaves for consideration questions about the permanency and the duration of

the relationship between the suppliers and the defendants, and also questions about control. Actually the argument of the defendants here is that the relationship found in the case at bar will not come under the definition of employment in the Act, broad as that definition is, because two very obvious features of the relationship are impermanence, and went of control on the part of the defendants. In the briefs this argument is stated in another and in a narrower way: the defendants urge that the act does not apply because there is no "contract" of employment. But what defendants really intend to say is that the personnel of the suppliers constantly shifts. Some drop out, and others commence to send in goods. There is no solicitation or at least no direct solicitation nor is there any direct advertising. The list of suppliers grows because women living in the neighborhood of those who are sending in goods learn about the enterprise and offer their product to the Wagner Corporation. Some of these persons unquestionably send their goods to other distributors besides Wagner. I can best summarize defendants' argument, I think, by paraphrasing, and in part quoting, portions of their reply brief. It is admitted that Wagner Corporation has held itself out as ready and willing to purchase what the home workers made, but this it did, so it is said, in the same sense in which "any dealer in merchandise is in the market to buy". Moreover, say the defendants, no *rights* are created until one party offers its goods and the other accepts them. Therefore, the argument runs that until a sale takes place, no obligation is created, and when it does, it has no retroactive effect so as to constitute an actual "hiring". In other words, the defendants admit that absence of supervision is irrelevant to the question of "control"; but they say that there is no hiring or employment even in the statutory sense, unless there is an obligation arising contemporaneously with the beginning of the relationship.

In the Needlecrafts case, supra, the court, 6 Cir., 139 F.2d 60, 63, 64, discusses Bowman v. Pace Co., 5 Cir., 1941, 119 F. 2d 858, 860, where "wage liability" was spoken of as the test of "employment". In the Needlecrafts case Judge Simons, interpreting the statute and the Bowman case, uses language which the defendants here not only quote but italicize in the brief. That language is to the effect that the coverage of the act extends to: "workers who perform for an industry under circumstances which create an obligation on the part of the industry receiving the benefit of such work, to pay compensation directly to them * * *".

I pass the point that this quotation is taken from its context, where Judge Simons was really dealing with the problem of the "independent contractor". What is more important is the question what was intended by the word "obligation" in the passage quoted.

The defendants, as I have already indicated, not only insist that "employment" requires an obligation: they say that the obligation must be contemporaneous with the creation of the relationship and that otherwise there is no hiring. They urge that no traditional bundle of rights and liabilities (including "obligation" to pay) is created until there has been acceptance of the goods, i. e., a sale.

I do not agree that Judge Simons used the word "obligation" in any such narrow sense. The whole tenor of his opinion in the Needlecrafts case contradicts any such notion. It is unnecessary to consider on broad grounds how defendants' position can be reconciled with the fact that Congress, by this statute, intended specifically to cover pieceworkers, whose legal relationship to their "employer" in many instances is only a "contract" by courtesy. It is only necessary to consider the specific facts in the case at bar to reach the conclusion that, here at least, the pieceworkers are in every fair sense of the word employees.

The defendants are constrained to admit that the very existence of their business depends upon the products of their suppliers. They point out, however, that they are free to reject any or all of the goods, or to vary prices as they wish. But common sense requires one to postulate that having created and organized their

308

business and presumably developed a market for their goods, the defendants are not going to reject articles sent to them to the point where they have no goods to supply (although they could do this "legally"), nor will they be foolish enough to slash prices to the point where they kill their source of supply (although they could also do this "legally"). One would rather expect that they will accept goods on a scale commensurate with their demands, and will pay prices which will insure a reasonably steady supply. And if they adopt this very sensible procedure they must necessarily follow what the plaintiff calls a "course of conduct", under which they "suffer" the suppliers to "work" for them. And there is surely upon them a continuing "obligation" to pay for the goods they receive and retain at reasonable prices and with reasonable promptness.

■ I see no insuperable objection to calling this a relationship of employment, under the statute, merely because there may be technical objections to suits for breach of contract by the workers, or similar suits by the defendants, or in general, difficulties about defining the incidents of the relationship in legalistic terms. It has been said before that the Wage and Hours Act gives rise to problems which cannot be dealt with mechanically. Perhaps it is true that the worker and the employer would be turned out of court in an action at law based upon their relationship, but that does not necessarily mean that the employer can refuse to comply with the act.[1]

The defendants make much of certain statistics which emerge from their transactions of 1948. There were, as I have said, 1105 suppliers. Only 18 of these averaged one shipment a month and only two averaged two shipments a month. Of the same total as many as 385 persons made sales to the company only once during the year, 251 made only 2 sales and 878 (87% of the total) made less than 5 sales. The average shipment amounted to less than three dozen garments. Still these figures show only that the bulk of the home workers are not as active as might be expected, and that in many instances the suppliers work only sporadically. If I am right in my reading of the Silk case, supra, this does not change the result.

Finally, the fact that in the Needlecrafts case, and others like it, the defendant furnished to the home workers a design which was to be followed does not, as defendants seem to think, establish that the act is inapplicable when no design is furnished. After all, the garments dealt in by the defendants can be made and marketed on the basis of three major designs. Minor differences, such as embellishment, are not of very grave importance and if they were, the evidence discloses that from time to time the defendants informed their suppliers concerning what was wanted in this respect. Over a period of time it must be obvious that explicit instructions to the suppliers would gradually become wholly necessary. Moreover, the possibility of rejection was no doubt much more effective than explicit instructions in advance. In other words, undoubtedly, new suppliers merely followed the motions of those who invited them to join the enterprise.

■ The plaintiff asks that the individual defendant Wagner be enjoined as well as the corporate defendant. There is no suggestion, however, that Wagner personally carried on any business during the period complained of, and while he does indeed dominate the corporate defendant I cannot see that it is necessary to enjoin him in his personal capacity.

The plaintiff is entitled to the relief which it seeks against the corporate defendant with costs; the judgment is to

[1]. As a matter of fact, it would not take much ingenuity to spell out an enforcible "contract" under the circumstances found in the case at bar, or perhaps a "quasi contract". A promise would surely be implied from the fact that the defendants became indebted to the suppliers by retaining their goods, and actually the defendants' "course of conduct" has at its root a general promise of payment to those who will produce the garments. The fact that the promise is subject to some escape clauses does not change its fundamental nature.

be settled on notice. The defendant Wagner, for the reasons stated, is entitled to a judgment, without costs, dismissing the complaint.

I have filed findings of fact and conclusions of law.