James P. MITCHELL, Secretary of Labor, United States Department of Labor

v.

Pearl L. NUTTER.

Civ. No. 1039.

United States District Court
D. Maine, N. D.

April 28, 1958.

**800**

Thomas L. Thistle, Regional Atty., U. S. Dept. of Labor, Wage & Hour Divn., Robert J. Nye, Boston, Mass., for plaintiff.

David A. Nichols, Camden, Me., for defendant.

GIGNOUX, District Judge.

This is an action brought by the Secretary of Labor under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq., to permanently enjoin defendant, a distributor of infants' knitted outerwear, from violating the provisions of the Act. Jurisdiction is conferred by § 17 of the Act. 29 U.S. C.A. § 217.

The complaint, filed August 13, 1957, as amended November 6, 1957, alleges violation by defendant of the provisions of §§ 15(a) (1), 15(a) (2), and 15(a) (5) of the Act, in paying wages to approximately 150 women (hereinafter descriptively called homeworkers) producing infants' knitted and crocheted outerwear which is sold by defendant in interstate commerce, at rates less than the minimum wage rates established by § 6 of the Act; and in failing to keep certain records, and to obtain special homework certificates with respect to such homeworkers as required by the regu- lations issued by the Administrator of the Wage and Hour Division, Department of Labor, under §§ 11(c) and 11(d) of the Act.[1]

At a pre-trial conference on November 6, 1957, it was conceded by defendant that the workers are engaged in the production of goods for interstate commerce and that, with respect to these workers, she has violated the minimum wage, record keeping, and homework certificate provisions of the Act, if the Act is applicable. It was further stipulated by the parties that the only issues for determination by this Court are whether the homeworkers producing the infants' knit- ted and crocheted outerwear sold by de-

[1]. The records required under authority of Section 11(c) of the Act are prescribed in Regulations, Part 516, Subparts A and B, 29 C.F.R. §§ 516.1–516.24.

The pertinent regulations issued by the Administrator under authority of Section 11(d) of the Act are Part 617, Employment of Homeworkers in the Knitted Outerwear Industry, 29 C.F.R. §§ 617.1– 617.12.

fendant are "employees" of defendant within the meaning of the Act and "industrial homeworkers" within the meaning of the applicable regulation. Defendant agrees that if these homeworkers are "employees" and "industrial homeworkers," she has violated the Act and the injunction must issue.

Evidence upon the issues as thus limited was heard by the Court on February 5 and 6, 1958. Extensive briefs were submitted by the parties on March 7, 1958, and reply briefs were filed on March 21, 1958.

The facts concerning defendant's business and her relationship to the homeworkers involved are as follows:

Since prior to November 20, 1954, defendant has been engaged at Troy, Maine, in the business of handling, selling and distributing handmade infants' knitted and crocheted outerwear, viz., bonnets, booties, sacques and sets consisting of all three items. The infants' outerwear handled by defendant is obtained by her from approximately 150 ladies, who either knit or crochet the garments from wool or orlon yarn. All the ladies do their work in their homes, most of which are on farms in the vicinity of Troy, and usually mail the finished garments to defendant when they have exhausted the supply of yarn they have on hand. Defendant exercises no direct supervision or control over the manner in which, or the time when, their work is performed. The ladies regard their work as "pick up" or spare-time work. The amount of business done by any one lady with defendant is small and depends upon the amount of spare time she has available from her normal household or farm duties. Defendant sets the prices which she pays for the finished garments on a piece-rate basis. Payment has been prompt, by check, and confirmed by a small card indicating the price paid, less the cost of yarn furnished by defendant, and the State of Maine sales tax deducted therefrom. It has been defendant's practice voluntarily to raise the prices paid by her when the cost of yarn has increased.

Until shortly before the trial of this case, the ladies obtained their yarn directly from defendant. It was the practice for them to order the yarn from defendant, who charged the cost against their accounts and deducted it from the price of the finished items when they were mailed in. Following the filing of the complaint in the instant action, and approximately two months before the trial, defendant notified the ladies that she would no longer be furnishing the yarn and that they could purchase yarn in the future from defendant's sister in East Corinth, Maine.

In many instances, defendant has supplied the ladies with samples of the work she desires. In other instances, the ladies have followed patterns obtained by them from magazines or other sources, but in such cases defendant's approval of the pattern to be used has been obtained. Defendant has not hesitated to suggest changes in a particular lady's work, such as the use of a different size needle or hook, a tighter or looser stitch, and sometimes the color of trim to be used, and the ladies have complied with these suggestions if they were able. Defendant is at all times free to reject any proffered work, but none has ever been rejected by her.

The ladies who deal with defendant have only a nominal investment, never exceeding $10, in equipment and materials, which consist solely of knitting needles or crochet hooks and the yarn. The ladies do not keep books or records, advertise, carry a line of samples or pictures of their work, have business stationery or cards, maintain an inventory, guarantee delivery at specified times, or have employees working for them. No one of them has ever sustained or expects to sustain a loss in connection with her work. All state that they enjoy their relationship with defendant and wish it to continue. Most of them have sent their goods exclusively to defendant since they first began dealing with her, although some have knitted or crocheted garments for persons other than defendant, including in one instance

some retail stores. Further, the ladies consistently testified that they regard the yarn they utilize as their own, that they do not decide to whom they will dispose of the finished garments until they have finished working on them and that defendant is under no obligation to accept finished garments shipped by them.

At her place of business in Troy, defendant employs one helper to add ribbon or embroidery to the garments received by her from the homeworkers, to assemble the garments in sets, and to package and ship the garments to her retail outlets. Defendant also maintains an inventory of goods, which varies in amount from season to season, keeps complete books and records, and engages a commission broker to sell the garments. Defendant concedes that the homeworkers are an essential part of her business.

As indicated, the issues reserved for determination by this Court are whether defendant's homeworkers are "employees" within the meaning of the Act and "industrial homeworkers" within the meaning of the applicable regulation.[2] On the foregoing facts it is clear that these homeworkers are industrial homeworkers as defined in the regulation if they are "employees" of defendant within the meaning of the Act, since the regulation incorporates the statutory definition and is otherwise conceded to be applicable to the operations of defendant's homeworkers.[3] The only substantial issue before this Court, therefore, is whether these homeworkers are "employees" of defendant within the meaning of the Act itself.

■ Since the decision of the Supreme Court in N.L.R.B. v. Hearst Publications, Inc., 1944, 322 U.S. 111, 128–129, 64 S.Ct. 851, 88 L.Ed. 1170, it has been settled that the test to be applied in the determination of the question here at issue is not the traditional test of the master-servant relationship under the common law, but whether or not these homeworkers are employees in the light of the history, terms and purposes of the Fair Labor Standards Act. Walling v. American Needlecrafts, Inc., 6 Cir., 1943, 139 F.2d 60, 63. See Walling v. Portland Terminal Co., 1947, 330 U.S. 148, 150–151, 67 S.Ct. 639, 91 L.Ed. 809; Rutherford Food Corp. v. McComb, 1947, 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772. And in determining that question the test is whether as a matter of "economic reality" a worker is an employee within the meaning of the Act itself, and not whether he is a servant 'according to the "technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants." United States v. Silk, 1947, 331 U.S. 704, 713, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757.

■ As stated by the Supreme Court in United States v. Darby, 1941, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, the purposes of the Fair Labor Standards Act, as set forth in the declaration of policy contained in § 2(a), are "to exclude from interstate commerce goods produced * * * under conditions detrimental to the maintenance of the minimum standards of living necessary for health and general well-being" (312 U.S. at page 109, 61 S.Ct. at page 455) and "to make effective the Congressional * * * policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions" (312 U.S. at page 115, 61 S.Ct. at page 457). Such being the purposes of the statute, its terms and history must be

2. Part 617, supra, fn. 1.

3. 29 C.F.R. § 617.1 contains the following definitions: "(b) 'Industrial homeworker' and 'homeworker', as used in this part, mean any employee employed or suffered or permitted to perform industrial homework for an employer."

"(c) 'Industrial homework', as used in this part, means the production by any person in or about a home, apartment, tenement, or room in a residential establishment of goods for an employer who suffers or permits such production, regardless of the source (whether obtained from an employer or elsewhere) of the materials used by the homeworker in such production."

examined to determine whether Congress intended to permit the interstate shipment of goods produced under substandard labor conditions in a home, when such goods would be excluded from interstate commerce if produced in a factory. McComb v. Homeworkers' Handicraft Cooperative, 4 Cir., 1949, 176 F.2d 633, 636.

The Act itself in § 3(e) defines "employee" as "any individual employed by an employer." 29 U.S.C.A. § 203(e). And "employ" is defined in § 3(g) as including "to suffer or permit to work." 29 U.S.C.A. § 203(g). At the time the Act was passed, Senator (now Mr. Justice) Black described this language as "the broadest definition that has ever been included in any one Act," 81 Cong. Record 7657, and in United States v. Rosenwasser, 1945, 323 U.S. 360, 362, 65 S.Ct. 295, 296, 89 L.Ed. 301, the Supreme Court stated in respect to this statutory language: "A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame." Certainly this statutory definition provides no real basis for excluding homeworkers from the coverage of the Act.

■ In addition to the broad statutory definition of the word "employee", the evident Congressional intent to include homeworkers within the scope of the Act is evidenced by § 6(a) of the Act (29 U.S.C.A. § 206(a)), which prescribes the minimum wage rates to be paid by every employer to each of his employees and provides that "if such employee is a home worker in Puerto Rico or the Virgin Islands" the employer shall pay "not less than the minimum piece rate prescribed by regulation or order." The inescapable implication of the authority thus granted the Administrator to relax statutory standards for homeworkers in Puerto Rico and the Virgin Islands is that homeworkers generally are included in the statutory definition of "employee." United States v. Rosenwasser, supra, 323 U.S. 363, footnote 4, 65 S.Ct. 297; see Gemsco, Inc., v. Walling, 1945, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921.

■ Were there doubt that the terms of the Act itself are broad enough to bring homeworkers within its scope, the legislative history of the Act gives added clarification to the Congressional intent. Thus, the original Black-Connery bill, progenitor of the present Act, contained a provision in § 6(a) giving the Board the power to define by regulation or order the determination of the number of employees employed by any employer to prevent the circumvention of the Act through the use of agents, independent contractors, subsidiary or controlled companies or "home or off-premise employees." S. 2475, 75th Cong., 1st Sess., 1937. This provision was eliminated in the Senate Committee as giving too much discretionary power to the Board, the Committee asserting, in reporting out the bill on July 8, 1937, that the purpose of the original § 6(a) was sufficiently served by the expanded definition of the word "employ" now incorporated as § 3(g), and that the words "suffered or permitted to work" then introduced for the first time, were designed to comprehend all of the classes of relationship which previously had been designated individually, and "to include all employees with the exception of persons employed in a bona-fide * * * executive capacity." S.Rept. 884, 75 Cong., 1st Sess., 1937, at p. 6. Assistant Attorney General (later Mr. Justice) Jackson testified before the Congressional Committees that the Black-Connery Bill was clearly designed to sanction control over industrial homework, saying that " * * * the factory which sends out and makes use of people in their homes are not exempted just because they are using premises they do not pay rent for." Joint hearings before the Senate Committee on Education and Labor, and the House Committee on Labor on S. 2475 and H.R. 7200, 75th Cong., 1st Sess. (1937), p. 77.

The subsequent legislative history provides additional evidence that the Act, as passed, contemplated coverage of homeworkers as employees. In 1939 several bills were introduced in the House proposing that the Act be amend-

ed to authorize the Administrator to permit the employment of homeworkers at wage rates lower than the statutory minimum. H.R. 5435; H.R. 7133; and H.R. 7349 (1939). Such amendments were obviously based on the assumption that homeworkers were then covered by the Act. In fact, the House Committee on Labor in its report accompanying the proposed amendments stated, "The Act at the present time treats home workers just as any other type of employee." H.R. 522, April 27, 1939, p. 10. The proposals failed, Congress thereby emphasizing its intent that the Act's protection extend to homeworkers.

Again in 1949, when the legislation which became the Fair Labor Standards Act Amendments of 1949 was pending in the Congress, an amendment was proposed to exclude homeworkers from the coverage of the Act. H.R. 5856 (1949). Its sponsor, Congressman Cooper of Tennessee, stated that the proposed amendment would exempt housewives in his part of the country "who have for several years made crocheted and knitted articles of wearing apparel, principally for babies, and sold them to anybody who might want to purchase them." 95 Cong. Record 11209. Although adopted in the House, the amendment was rejected in the Senate and did not survive in conference. The conference report makes it clear that the omission was not unintentional. House Rept.No. 1453, 95 Cong. Record 14933. On the contrary, the conference agreement added the present § 11(d) of the Act, specifically authorizing the Administrator to make regulations and orders regulating, restricting or prohibiting industrial homework and continuing in full force and effect all then existing regulations or orders of the Administrator relating to industrial homework. One of the orders then in effect was the Second Wage Order for the Knitted Outerwear Industry. 29 C.F.R. Chapter 5, Part 617, effective April 20, 1942.

The legislative history subsequent to the enactment of the Fair Labor Standards Act Amendments of 1949 is similarly compelling evidence of the original and continuing intention of Congress to include industrial homeworkers within the scope of the Act. Since 1949 the attempt to specifically exempt homeworkers from the minimum wage and overtime requirements of the Act has not ceased, although Congress has consistently failed so to restrict the scope of the Act. See H.R. 4661, 82d Cong., 1st Sess., June 29, 1951, introduced by Congressman Cooper; H.R. 237, 83d Cong., 1st Sess., January 3, 1953, introduced by Congressman Cooper; S. 1950, 83d Cong., 1st Sess., May 20, 1953, introduced by Senator Kefauver; H.R. 84, 84th Cong., 1st Sess., January 5, 1955, introduced by Congressman Cooper; S. 2963, 84th Cong., 2d Sess., January 18, 1956, introduced by Senator Payne; H.R. 8809, 84th Cong., 2d Sess., January 25, 1956, introduced by Congressman McIntire; H.R. 2818, 85th Cong., 1st Sess., January 14, 1957, introduced by Congressman McIntire; and S. 1160, 85th Cong., 1st Sess., February 11, 1957, introduced by Senator Smith.

Just as the legislative history of the Act compels the conclusion that Congress intended to include industrial homeworkers within its coverage, so have the judicial decisions interpreting and applying the Act consistently held that it is applicable to homeworkers engaged in activities substantially such as those of the homeworkers who are dealing with the defendant in this case. Fleming v. Palmer, 1 Cir., 1941, 123 F.2d 749, certiorari denied sub nom., Caribbean Embroidery Cooperative, Inc., v. Fleming, 1942, 316 U.S. 662, 62 S.Ct. 942, 86 L.Ed. 1739; Tobin v. Edward S. Wagner Co., 2 Cir., 1951, 187 F.2d 977, approved in Mitchell v. Edward S. Wagner Co., 2 Cir., 1954, 217 F.2d 303, certiorari denied, 1955, 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 752; McComb v. Homeworkers Handicraft Cooperative, 4 Cir., 1949, 176 F.2d 633, certiorari denied, 1949, 338 U.S. 900, 70 S.Ct. 250, 94 L.Ed. 553; Walling v. Twyeffort, Inc., 2 Cir., 1947, 158 F.2d 944, certiorari denied, 1947, 331 U.S. 851, 67 S.Ct. 1727, 91 L.Ed. 1859; Walling v. American Needlecrafts, Inc., 6

Cir., 1943, 139 F.2d 60; Mitchell v. Northwestern Kite Co., D.C.Minn.1955, 130 F.Supp. 835; Durkin v. Shone, D.C. E.D.Tenn.1953, 112 F.Supp. 375; McComb v. Edward S. Wagner Co., D.C. E.D.N.Y.1950, 89 F.Supp. 304, reversed on other grounds sub nom. Tobin v. Edward S. Wagner Co., 2 Cir., 1951, 187 F.2d 977; Walling v. Freidlin, D.C.M.D. Pa.1946, 66 F.Supp. 710; Walling v. Wolff, D.C.E.D.N.Y.1945, 63 F.Supp. 605; Fleming v. Demeritt Co., D.C.Vt. 1944, 56 F.Supp. 376. Probably the only case holding that homeworkers are not employees within the scope of the Act is Walling v. Todd, D.C.M.D.Pa.1943, 52 F. Supp. 62, which was expressly overruled in Walling v. Freidlin, supra, as based on the false assumption that the traditional common law definition of master and servant was the controlling consideration.

Fleming v. Palmer, supra, a controlling decision in this circuit, although the Court was there concerned primarily with the effect of the intervention of a cooperative, is substantially on "all fours" with the present case in holding that homeworkers are to be treated as employees under the Act. So also are Walling v. American Needlecrafts, Inc., supra, and McComb v. Edward S. Wagner Co., supra, both involving homeworkers in the needlework trades. In Wagner, 89 F.Supp. 304, supra, Kennedy, J., found homeworkers in the knitted outerwear industry, whose relationship with the Edward S. Wagner Company was almost identical to the relationship of the homeworkers with the defendant in the present case, to be employees under the Act. See further the decision of the United States District Court for the Western District of Tennessee in Mitchell v. Law, 161 F.Supp. 795, in which homeworkers producing infants' knitted outerwear were held to be employees under the Act.

It has been suggested in this, as in the Wagner case, that six criteria for determining whether or not an employment relationship exists may be drawn from the leading Supreme Court decisions on employment relationships under this Act and the related Social Security and National Labor Relations Acts. 42 U.S.C.A. § 301 et seq.; 29 U.S.C.A. § 141 et seq. These suggested criteria are: (1) the extent to which the services in question are an integral part of the "employer's" business; (2) the amount of the "employee's" investment in facilities and equipment; (3) the nature and degree of control retained or exercised by the "employer"; (4) the "employee's" opportunities for profit or loss; (5) the amount of initiative, skill, judgment or foresight required for the success of the claimed independent enterprise; and (6) the permanency and duration of the relationship. Rutherford Food Corp. v. McComb, 1947, 331 U.S. 722, 729, 67 S. Ct. 1473, 91 L.Ed. 1772; United States v. Silk, 1947, 331 U.S. 704, 716–719, 67 S.Ct. 1463, 91 L.Ed. 1757; Bartels v. Birmingham, 1947, 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947; N.L.R.B. v. Hearst Publications, Inc., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170.

While recognizing that no single factor or group of factors can be controlling, the Court in Wagner applied the foregoing criteria to answer the defendant's contention that the ladies supplying knitted outerwear for Wagner were independent contractors and not employees. In a carefully considered opinion the Court there said in language which is equally applicable to the case at bar (89 F.Supp., at page 306):

"* * * There is no question at all that those who supply Wagner products are an integral part of the business. Nor is there any doubt that the investment in facilities and equipment on the part of these suppliers is negligible in amount. Again, the opportunity for profit or loss arising from sound management, or the risk undertaken is negligible or nearly so. The suppliers in this case, as in the case of ordinary pieceworkers under the coverage of the act will be compensated in proportion not to their sound management but to the number of pieces

they turn out, because they must take Wagner's price or leave it. And for the same reason initiative, judgment, and energy play a very minor role in the 'enterprise' which the suppliers conduct."

The employment relationship involved in Wagner was identical to the instant one. In fact, one of the present defendant's witnesses testified that she formerly supplied the same type articles to Wagner.

In Wagner, as in the instant case, the defendant also contended that an employment relationship was negatived by the impermanency of the defendant's relationship with the homeworkers and by the defendant's lack of control over the homeworkers. In response to this contention, the Court said (89 F.Supp. at pages 307–308):

"The defendants are constrained to admit that the very existence of their business depends upon the products of their suppliers. They point out, however, that they are free to reject any or all of the goods, or to vary prices as they wish. But common sense requires one to postulate that having created and organized their business and presumably developed a market for their goods, the defendants are not going to reject articles sent to them to the point where they have no goods to supply (although they could do this 'legally'), nor will they be foolish enough to slash prices to the point where they kill their source of supply (although they could also do this 'legally'). One would rather expect that they will accept goods on a scale commensurate with their demands, and will pay prices which will insure a reasonably steady supply. And if they adopt this very sensible procedure they must necessarily follow what the plaintiff calls a 'course of conduct', under which they 'suffer' the suppliers to 'work' for them. And there is surely upon them a continuing 'obligation' to pay for the goods they receive and retain at rea-

sonable prices and with reasonable promptness."

■ Upon the record in the instant case this Court can find no substantial basis for distinguishing the relationship of the homeworkers with this defendant from that which the Court in Wagner found to be an employment relationship within the scope of the Fair Labor Standards Act. Nor does the present record disclose any exception to usual homework practice, which has been uniformly held to be subject to the Act.

■ The defendant argues finally that the effect of the Act's application to her will be to put her out of business, since her operation cannot support payment of the required minimum wage to these homeworkers. This cannot, however, alter the fact that "the construction and interpretation of statutes cannot extend to amendment or legislation * * * nor can considerations of apparent hardship justify a strained construction of the law as written * * *. 'The remedy,' if any be required, 'is in Congress.'" Ladew v. Tennessee Copper Co., C.C.S.D.Tenn.1910, 179 F. 245, 252, affirmed, 1910, 218 U.S. 357, 31 S.Ct. 81, 54 L.Ed. 1069.

It is the conclusion of this Court that the statutory language, the legislative history and purposes, and the judicial decisions interpreting and applying the Fair Labor Standards Act establish beyond question that defendant's homeworkers are her employees within the meaning of the Act, and hence "industrial homeworkers" within the meaning of the applicable regulation. Since it has been stipulated by defendant that she concedes violation of the minimum wage, record keeping and homework certificate provisions of the Act if the Act be found applicable to her, it follows that plaintiff is entitled to judgment in accordance with the relief demanded in his complaint.

Judgment will be entered accordingly, and plaintiff will submit a proposed form of judgment.